[No. A039377. First Dist., Div. Five. June 1, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
DOLLAR RENT-A-CAR SYSTEMS, INC., et al., Defendants and
Appellants.

COUNSEL

Theodore F. Schwartz for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Herschel T. Elkins, Assistant Attorney General, and Christopher M. Ames, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

LOW, P. J.—The Attorney General of the State of California obtained a civil judgment and permanent injunction against defendants for engaging in unfair competition and making false and misleading statements. (Bus. & Prof. Code, §§ 17200, 17500.)[1] A civil penalty of $100,000 was imposed for the statutory violations on all defendants,[2] jointly and severally. (§§ 17206, 17536.) We affirm.

---

[1] Hereafter, all section references are to the Business and Professions Code unless otherwise indicated.

[2] Defendants are Dollar Rent-A-Car Systems, Inc.; its two wholly owned subsidiaries, Dollar Rent-A-Car of San Francisco, Inc., and Dollar Rent-A-Car of Southern California, Inc.; and Henry J. Caruso, the majority shareholder in the parent company and chief executive officer of all three corporate entities (hereafter collectively referred to as Dollar or defendants).

Defendants operate car rental agencies at airports and other locations in California. From 1979 to 1985, in conjunction with the execution of the car rental agreements, defendants' agents offered customers a "Collision Damage Waiver" (CDW) for $3 to $11 per day. CDW was misrepresented as "insurance" or "additional coverage" which would protect the renter against liability in the event of an accident and damage to the car. Agents also incorrectly informed renters that CDW would protect them against ordinary negligence. Renters were erroneously advised that if they declined to purchase CDW they would be liable only up to a specified amount, i.e., $500. In truth, upon execution of the contract, the renters became absolutely liable for damages, the extent of which depended on whether the renter was negligent and if he bought CDW. CDW was not insurance, despite being so represented, and its purchase did not protect a customer from liability for damage caused by the customer's ordinary negligence. If CDW was purchased, defendants agreed to waive their right to collect damages up to a specified amount in case of an accident which was not caused by the customer's negligence. A customer who declined CDW would be expected to pay the full damage of the car and loss of use if defendants concluded the customer was at fault. If the customer declined CDW and the car was damaged through no fault of his, that person would be liable up to the contractual limits of liability. These limits ranged from $500 to $2,500 at the time of trial in 1986.

In pursuing accident claims against its customers, Dollar charged a "retail" rate which was higher than the actual "wholesale" cost to repair the cars. Additionally, customers were charged a "retail rental rate" for the time the car was out of service. This rate was not the average or actual rental rate the customer was in fact charged for the car.

On December 22, 1981, a complaint was filed charging defendants with unfair competition and making misleading and untrue statements in violation of sections 17200 and 17500. A preliminary injunction issued on February 27, 1984, which enjoined defendants from making such misrepresentations and required certain changes in contract language, rental policies and collection practices while an outcome of the merits was pending.

We review the evidence in the light most favorable to the prevailing party. (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) Former customers testified that Dollar's agents specifically referred to CDW as insurance and/or coverage when offering CDW, and they were led to believe they were purchasing liability insurance which would cover them in the event of an accident, even if they were at fault. The agents did not explain to them that ordinary negligence would void CDW. Nor did the agents describe what constituted negligent acts. Those customers who declined CDW were misled into believing they

were liable for damages only up to a specified amount, e.g., $500. The agents never advised these customers that the purchase of CDW did not absolve them of liability for the full value of the car in the event of ordinary negligence. For example, one customer, Shirley Van Wambeke, told the Dollar agent she wanted "full insurance coverage." The agent directed Ms. Van Wambeke to initial the box accepting CDW. At no time did the agent tell Van Wambeke that CDW was *not* insurance.

Van Wambeke was hit by a speeding car as she pulled out of a parking space. She telephoned Dollar and was told that she was covered regardless of fault because she had purchased full insurance. When she returned the car to the agency, Dollar refused her another car, telling her she had been negligent. Before leaving California, she contacted Dollar again and was told there were no problems because she was fully insured. Later, she received a demand letter for $3,086.31 from Dollar. She wrote to Dollar for an explanation but received no reply. Ultimately, the matter was settled by her insurance company.

Another rental customer, Jeffrey Bloom, purchased the $500 CDW option believing this to be his maximum liability in the event of an accident. After the Dollar rental agent referred to CDW as insurance, he did not expect to pay anything if the damage was not his fault. Bloom struck a car in an intersection as the other car ran a red light. Bloom testified the damage was limited to a fan blade. Bloom was given a replacement car, and upon returning the car the rental agent demanded $1,200 on the spot and insisted that Bloom authorize a $500 charge on his credit card. The agent did not provide Bloom with any written estimates or invoices for the damage. The agent told Bloom, who was visiting California, that he could not leave the state until he satisfied the obligation. Bloom subsequently received a demand for $1,686.25 from Dollar's lawyer, and when Bloom asked for substantiation of the claim for damages over $250, the attorney never responded to the letter.

Dollar's agents were confused about the difference between liability insurance and CDW even after receiving training on the subject. One of the training manuals used in 1979 defined CDW as collision insurance, which, if purchased, waived the company's deductible. There was testimony that 75 percent of the time the agents referred to CDW as insurance. No simple lay version of the contract was supplied to customers. It was not the agents' practice to explain the contract terms, particularly what is meant by "violation of the contract." When the agents could not answer the customers' questions about CDW, they directed the customers to the reverse of the rental agreement which contained the CDW provisions. Supervisors and senior personnel frequently were not available to answer the agents' questions.

One Dollar employee testified she believed not every renter understood CDW; that she never informed a customer that he/she was absolutely liable for damage to the vehicle; and that she heard rental agents describe CDW incorrectly. Dollar's assistant manager at the San Francisco airport told customers CDW was insurance when she first started with the company in 1979. She heard other agents do the same and even her trainer referred to CDW as insurance. She did not fully understand the rental agreement at first and few customers read the back of the agreement. Those few who did, complained they had trouble reading the small print and they did not understand its terms. Sometime after 1981 (the date this complaint was filed), she was instructed not to refer to CDW as insurance. From that time, she told customers who did not purchase CDW that their liability was limited to the amount specified in the contract. This is error. Prior to the lawsuit in 1981, she heard other agents describe CDW as, " 'You smash 'em, you crash 'em, you're covered.' "

The misleading nature of the CDW provision to both customers and agents was well known to Dollar's executives. James E. Saunders, general manager in San Francisco, sent a June 22, 1982, memorandum to employees stating his agents had informed him the customers are still confused that CDW is insurance and also that several employees who had been trained are confused about the distinction. Saunders acknowledged that one of the training manuals used during this period referred to CDW as collision insurance. He conceded that agents do not inform customers they are absolutely liable for damage to the car. While the agents are instructed to inform the customers that CDW is voided upon breach of the rental agreement, they do not affirmatively state that this includes ordinary negligence. A "counter card" supplied to the rental agents explains the contract is voided by ordinary negligence, but agents do not read it to every renter. The agents do not describe what acts constitute negligence. Saunders conceded that in the short time taken to process rental transactions (four minutes on the average), agents sometimes mislead customers about the effect of CDW.

The body shops charged defendants a discounted "wholesale" price for repairs to the cars due to the high volume. Additionally, defendants supplied their own parts which they purchased at more than a 30 percent discount. Defendants prepared new repair invoices to reflect a higher "retail cost" rather than these actual costs for repair. They never informed the customers of this practice, nor did defendants supply customers with an itemized list of the inflated charges. This practice left customers with the erroneous impression that defendants are passing on only the actual repair charges. Dollar's president, Henry J. Caruso, defended this practice, explaining the higher repair rate was necessary to absorb increased labor costs incurred in arranging for the repairs and to offset depreciation of the

damaged cars upon resale. However, Caruso could not supply data to support his assertion.

Dollar used three versions of the rental agreement printed in January 1977, October 1980 and November 1981. In the earliest form of the rental agreement, the face of the contract has three boxes containing the CDW options: "Collision Damage Waiver," "$250.00 Collision Liab.," and "$500.00 Collision Liab." Each box contains small print directing the renter to the back of the contract for the explanation of each option. The back of the contract was almost completely covered with 20 paragraphs of very small print. A customer would have to be an extraordinarily fast reader with remarkable eyesight to read the entire contract during the average four-minute rental transaction. For example, four of the twenty paragraphs of legalese provide: "2. . . . Lessee shall be fully liable for all collision, fire and theft damage and all other loss, if vehicle is used, operated or driven in violation of any of the provisions of this agreement. If the vehicle is used in accordance with this agreement and Lessee has rejected full collision coverage on page 1, Lessee shall be responsible only for the first $250.00 or $500.00 of collision damage to the car, depending on coverage as initialed by Lessee on page 1 of this agreement, and providing all of the conditions of this agreement are met by Lessee.

". . . . . . . . . . . . . . . . . . .

"18(a). Full Collision Protection. By Lessee's initial on page 1 and payment of an additional charge, Lessor waives claim for the first $250 of damage by collision to the rented vehicle.

"18(b). $250 Collision Liability. By Lessee's initial on page 1, Lessee elects not to purchase full collision protection and agrees to be responsible for the first $250 damages to the rented vehicle while it is in Lessee's possession.

"18(c). $500 Collision Liability. By Lessee's initial on page 1, Lessee elects not to purchase full collision coverage and agrees to pay 20% of the total rental charge or $2.50 minimum daily charge, whichever is greater, for full collision protection coverage over $500, and accepts full responsibility for all damages to the rented vehicle up to $500.

"SPECIAL NOTE: Excluded from the foregoing collision protection provided by 18A, B, And C, are vehicle damages arising from operation of the rented vehicle under the influence of drugs or alcohol or in violation of criminal or motor vehicle statutes, or is grossly negligent in operation of the vehicle or otherwise violate the terms of this rental agreement."

In the two subsequent contracts, the CDW section on the front of the contract has been changed to include the language " 'CDW' IS NOT INSURANCE" and provides only space to accept or decline CDW; there are no options. Immediately to the left are printed statements: "THE LIMITED 'CDW' DOES NOT APPLY TO DAMAGES ARISING OUT OF CUSTOMER'S NEGLIGENCE. [¶] CUSTOMER IS RESPONSIBLE FOR ALL DAMAGE TO THE RENTED VEHICLE RESULTING FROM CUSTOMER'S NEGLIGENCE." As before, the customer is referred to the back of the page for an explanation. It provides: "3. CUSTOMER agrees to pay DOLLAR on demand: . . . (F) The retail value of repairing all damages to said vehicle resulting from collision or upset, including 'loss of use' of the rental vehicle during the period it is unavailable for use, as measured by the reasonable retail rental value of a replacement vehicle, provided however, if said vehicle is operated in accordance with all terms hereof, CUSTOMER'S liability for such damages; (i) shall be waived if CUSTOMER has agreed in advance to pay the additional rental and selected the LIMITED COLLISION DAMAGE WAIVER option; (ii) shall not exceed [$500 or other specified amount], depending upon the option selected by CUSTOMER by initialling in the appropriate place provided on page two hereof . . . ." (Italics omitted.)

The third version was identical with the second in all critical aspects, except the printing bled through the paper stock and was completely illegible. This edition was in use up to two months.

### I

Defendants contend the statement of decision is deficient because it does not state, with particularity, the specific facts relied upon by the court in making its findings. In opposition to the proposed statement of decision, defendants requested the court to identify the specific facts, dates, acts, and contract language constituting the unlawful business practices and to identify the persons to whom these statements were made. This request was denied.

In its statement of decision, the trial court found defendants, through their employees, made oral misrepresentations and committed other acts which violated the statutes and also identified the particular acts to be enjoined. Specifically, the court found: (1) the employees made untrue and confusing representations and caused customers to be misled into believing (a) CDW was insurance, (b) purchasing it would insure them against liability for damage to the cars, (c) a customer's maximum liability for damage if he did not purchase CDW was limited to a specified amount, e.g., $2,500; (2) defendants used in excess of 500,000 contracts between 1979 and 1983 which were deceitful, misleading and ambiguous on the extent of the customer's liability for damages and on the coverage provided by CDW, and

were adhesion contracts; (3) in more than 1,500 repair jobs between 1979 through 1983, defendants misrepresented the cost of repairs and loss of use of the damaged vehicles when pursuing claims against their customers; (4) from 1979 through October 1986, while these violations occurred, Dollar of Southern California had at least 700,000 rental transactions; and Dollar of San Francisco had at least 300,000 rental transactions; and (5) the court found the defendants to be jointly and severally liable. The court issued a permanent injunction which barred the continuation of these business practices, required changes in training procedures, and ordered defendants to pay a civil judgment in the amount of $100,000.

"The court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial." (Code Civ. Proc., § 632.) ■ The trial court is required only to state ultimate rather than evidentiary facts. (*People* v. *Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 524 [206 Cal.Rptr. 164, 53 A.L.R.4th 661].)

■ In its statement of decision, the trial court detailed the misrepresentations made by the employees which it found were misleading and/or untruthful, e.g., that CDW was insurance and that the renter's negligence will be covered by CDW. The court expressly disapproved contractual language containing the words "deductible" or "coverage" as creating the misperception that CDW was insurance. The court also found that several hundred thousand of these misleading contracts were used during the period being litigated. Additionally, it expressly determined that defendant Caruso controlled the terms and conditions for the rental of the cars, including the sale of CDW. This statement of decision amply sets forth the factual and legal basis for deciding the material issues placed into controversy by the pleadings, as required by Code of Civil Procedure section 632.

Defendants would require the court to make detailed findings of evidentiary facts as to each individual piece of evidence relied upon by the trial court. Under the law, defendants are not entitled to such a detailed analysis. We conclude the statement of decision fairly discloses the court's determination of all material issues of fact.

## II

■ There is substantial evidence to support the judgment. The People's first cause of action charged defendants with making false or misleading statements in violation of section 17500. That section prohibits the use of any untrue or misleading statement in selling real or personal property or personal services. ■ The prohibition extends to the use of false or misleading oral statements. (*People* v. *Bestline Products, Inc.* (1976) 61

Cal.App.3d 879, 906-909 [132 Cal.Rptr. 767].) In order to recover under that section, it is necessary to show only that members of the public are likely to be deceived. Actual deception or confusion is not required. The court may order relief "without individualized proof of deception, reliance, and injury if it 'determines that such a remedy is necessary "to prevent the use or employment" of the unfair practice . . . .' [Citation.]" (*Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 211 [197 Cal.Rptr. 783, 673 P.2d 660]; *Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 875-876 [127 Cal.Rptr. 110, 544 P.2d 1310].) ■ In the second cause of action, plaintiff alleges unfair competition in violation of section 17200. Unfair competition is defined as including an "unlawful, unfair or fraudulent business practice and unfair, untrue or misleading advertising . . . ." (§ 17200.) ■ False and misleading representations necessarily constitute unfair business practices within the meaning of that statute. This section is designed to protect consumers against fraud and deceit as well as to protect competitors (*Committee on Children's Television, Inc., supra,* at p. 209), and is broadly interpreted to bar all ongoing wrongful business activity in any context in which it appears. (*Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 929 [216 Cal.Rptr. 345, 702 P.2d 503].)

■ The language of the CDW provision and the manner in which it is represented by defendants' employees are misleading or deceptive, a violation of the statutes. Defendants concede the agents' statements conflict with the contract language, but argue that these "sporadic statements, made by lower level employees," do not establish a business practice. The testimony of former customers, rental agents, and even the testimony of defendants' executives, demonstrate a history of false and misleading business practices and training procedures which had the actual, if not intended, effect of confusing the car rental public about the liability protection afforded by CDW and deceived customers into purchasing CDW under false pretenses. There is substantial evidence to support the trial court's findings.

Defendants argue there was no misrepresentation regarding the cost of repairs since they billed the customers only what the contract permitted. We disagree. Defendants' practice of charging its customers a higher "retail repair rate" without explanation or substantiation is a deceptive business practice which falls within the protection of this statute.

The earliest contract did not contain any notice that the customers would be billed at the inflated retail rate even though this was defendants' practice at the time. The language in the subsequent contracts that customers were liable for the "retail value" of all damages does not resolve the ambiguity. The absence of any notice that the customers are liable for damages or loss of use beyond their actual cost is misleading and constitutes an unfair

business practice. Even on the chance that a customer would have read the entire agreement, front and back, it is unreasonable to expect that person to understand he was liable for a sum considerably in excess of defendants' actual repair costs or rental charges. Defendants do not otherwise explain the practice. One can conclude that this language was reasonably likely to confuse and mislead.

Dollar's claim that this practice is justified to offset legitimate business costs associated with repairing the cars, i.e., the additional labor costs required to arrange for the repairs and the additional depreciation of the damaged vehicle, rings hollow. Defendants did not provide supporting data at trial to substantiate the increased cost of time and labor. In fact, Caruso conceded that defendants never analyzed the value of cars lost to depreciation, which he claimed justified this practice. There is evidence that defendants improperly doubled the number of days they claimed a car was out of service and arbitrarily overcharged its customers for repairs made without regard to the extent of damage or the "retail rate." Saunders, in an inter-office memorandum, referred to a bill of $1,485 for damages to a car rented by William Russo as "[p]ure fiction." "There was damage, but aside from a broken window we did the repairs ourselves and our cost was less than $500.00." In another instance, defendants claimed damages to a car in the amount of $2,500 when the actual repair cost was $1,304.45 plus $40 for towing, and then claimed loss of use was 43 days when it only amounted to 21 days.

An estimator for a body shop used by defendants testified that he "bumped up" the number of hours charged in order to offset the low wholesale rate paid by Dollar. The actual cost was further inflated when defendants' employees prepared the "retail" bill sent to the customer for collection. These business practices are deceptive and misleading in the extreme and cannot be justified by any of defendants' explanations.

Defendants also challenge the trial court's finding that the contracts were "ambiguous, misleading and deceptive in both format and content, both as to the extent of customers' responsibility for damage to the rental vehicle and the coverage provided by CDW." Defendants' agents themselves testified that virtually no one read the back of the contract which purported to explain CDW. Looking at the documents we do not wonder why. Several contracts were used during this period. In each revision, the print on the reverse side is small and dense and covers almost the entire page. In the early contract, there are no terms which stand out or are otherwise emphasized. A fair reading of the relevant paragraphs left the average reader with the impression that the purchase of "Full Collision Protection" provides complete liability protection for any accident, even one arising out of the renter's ordinary negligence. The two remaining options, "$250 Collision

Liability" and "$500 Collision Liability," seem to provide the same liability coverage, except for the specified deductible. Nowhere does this agreement inform the renter that CDW is voided for ordinary negligence.

In the later contracts, some terms are printed in bold type or underlined. But that does not make the contract easier to read or less confusing. Though the front of these latter agreements plainly state that CDW does not apply to damages arising out of a customer's negligence, it is too much to expect the vast majority of customers to connect this limitation with the description of the CDW provision on the reverse side. This is especially true since the terms run counter to most persons' common experience with insurance coverage.

Even if the customers had read the contract, defendants' own evidence established that they still would be confused, as detailed in General Manager Saunders's internal memorandum to the employees. Employees were trained with an enlargement of the contract and a "plain English" version of its provision, neither of which were provided to the customers. Defendants offer no reason why they could not insert into the contract the simplified explanation of CDW provided to their agents during training. Even one of the training manuals used by the rental agents describes CDW as insurance. The training procedures manual gives no definition of negligence. Most telling is Saunders's testimony that the environment of a crowded rental car office would cause agents to make mistakes while explaining CDW. Despite this potential for confusion, there are insufficient numbers of supervisory personnel available to answer the agents' or customers' questions. With full knowledge of these difficulties, defendants instruct their agents to sell CDW aggressively in return for sales commissions and other incentives. This entire process makes confusion not only likely, but inevitable.

The complex language, the miniscule print size and format, combined with defendants' knowledge that its own trained agents give erroneous explanations, provide ample evidence to support the trial court's finding.

■ Defendants argue that there is no statutory violation if the customer does not even read the contract. Such an interpretation would defeat the purpose behind the statutes. These statutes protect against the *likelihood* of deception to the public, not just *actual* harm. (*Committee on Children's Television, Inc.* v. *General Foods Corp., supra,* 35 Cal.3d at p. 211.) The court may impose liability and civil penalties without individualized proof of reliance, deception and injury if it is convinced that such a remedy is necessary to deter this unfair practice. (*Ibid.; People* v. *Toomey* (1984) 157 Cal.App.3d 1, 16, 23 [203 Cal.Rptr. 642].) The evidence amply supports the court's finding of violations of sections 17200 and 17500.

## III

■ Defendants contend the imposition of the penalties was speculative and unsupported by the evidence. The court may impose a civil penalty of $2,500 for each violation of section 17200 and section 17500, for a total penalty of $5,000 for each unlawful act. (§§ 17206, 17536.) The evidence indicates defendants used well over 500,000 misleading and deceptive contracts between 1979 and October 1983; their agents made numerous but unspecified oral representations, and over 1,500 false repair invoices were sent to customers to collect damages. Under these circumstances, the imposition of the $100,000 civil penalty was abundantly justified.

■ We also conclude the trial court properly imposed liability on Caruso individually. Caruso is the majority stockholder and chief executive officer of all the defendant companies. He has authority to approve, and did approve, the rental agreements used herein. He is the only one who set the terms and conditions for the sale of CDW. The evidence indicated he knew or reasonably should have known that agents were selling and customers were buying CDW without being properly advised of its purpose and limitations. He, more than anyone else, was responsible for the confusion over CDW; he authorized the practice of billing customers more than the actual repair costs and personally approved the continued use of deceptive and ambiguous rental agreements. Because of his control over the policies and procedures followed by defendant corporations, Caruso participated in the unlawful practices as if he personally made the misrepresentations. (*People v. Toomey, supra,* 157 Cal.App.3d at pp. 14-16.)

The judgment is affirmed.

King, J., and Haning, J., concurred.