[No. A083939. First Dist., Div. Two. Mar. 7, 2000.]

PETER SCHNALL, Plaintiff and Appellant, v.
THE HERTZ CORPORATION, Defendant and Respondent.

COUNSEL

Tatro, Coffino, Zeaven & Bloomgarden, Michael Coffino, Robert A. Zeavin and Arthur J. Friedman for Plaintiff and Appellant.

Heller, Ehrman, White & McAuliffe, Peter S. Hecker, Anna S. McLean, Daniel K. Slaughter and M. Claire Fehrenbacher for Defendant and Respondent.

OPINION

**KLINE, P. J.**—Appellant Peter Schnall filed this class action[1] complaint seeking damages and injunctive relief against respondent Hertz Corporation (Hertz). His chief allegation was that, because Hertz's fuel service charge was "excessive and punitive," the rental agreement was unlawful, unfair and fraudulent within the meaning of the unfair competition law (Bus. & Prof. Code, § 17200) (hereafter the UCL) and an unconscionable contract of adhesion that was void as a matter of law. He alleged as well that, apart from the amount of the fuel service charge, provisions of the rental agreement purporting to disclose the charge were incomprehensible and misleading and also constituted an unfair and fraudulent practice under the UCL. Hertz demurred to the amended complaint on the ground plaintiff failed to state facts sufficient to constitute any of the alleged causes of action. The trial court sustained the demurrer without leave to amend and entered judgment for Hertz, dismissing the action with prejudice. This timely appeal is from that order.

## I. Facts and Procedural Background

The facts are simple and, for present purposes, essentially undisputed. In 1995 appellant rented a car from Hertz in New York City for approximately one day. Like all renters, he was provided a car containing a full tank of gas. The standard rental agreement he signed required him to choose at the commencement of the rental whether to purchase fuel from Hertz. Paragraph 8 of the agreement, which is the focus of this litigation and is set forth in its entirety in the margin below,[2] describes the two available options.

The first option, which was selected by appellant and members of the class he purports to represent and is most directly at issue, is not to purchase

---

[1]Hertz did not challenge, and the rulings of the trial court do not address, the class action allegations set forth in the complaint, and that matter is not here before us.

[2]"8. Fuel and Service Charge.

"(a) If You Do Not Purchase Fuel from Hertz at the Commencement of Your Rental and You Return the Car with Less Fuel Than Was in It When You

fuel from Hertz at the commencement of the rental. If the customer makes this choice and returns the car with a tank as full as when it was delivered, no fuel service charge is imposed. If, however, a renter who selects this option returns the car with less than a full tank, Hertz imposes a charge for fuel and the service of refueling. The amount charged for this service is not disclosed in the rental agreement itself; paragraph 8 simply indicates that the fuel service charge will be based on a "per mile" or "per gallon" rate "specified on the Rental Record." The "Rental Record," which is not described in the rental agreement, is a small single-page computer printout containing a list of optional services, each designated by abbreviation, together with an indication of which, if any, the renter has "declined."

The complaint alleges that both the per mile and per gallon rates result in a fuel service charge that is "in excess of two and one half times the prevailing average retail price of fuel . . . ." For example, because he elected not to purchase fuel from Hertz at the commencement of the rental, did not purchase fuel during the rental, and returned the car with less than a full tank, Hertz multiplied the number of miles appellant drove times a per mile rate of $.168, which according to the complaint reflected a price per gallon of gas of approximately $3.19.[3]

The second alternative Hertz offers, which appellant and members of the putative class rejected, permits renters to pay for the full tank of gas they receive from Hertz at the commencement of the rental. The amount charged renters who elect this so-called "fuel purchase option" is not disclosed in the rental agreement, but is "the amount shown on the Rental Record for that purchase." If the renter selects this option no additional fuel service charge is imposed upon return of the car; however, as stated in the rental agreement,

---

RECEIVED IT, Hertz will charge you for fuel and the service of refueling at the applicable rate specified on the Rental Record, determined as follows:

"(i) If you do not buy fuel during the rental, this charge will be the number of miles driven, as shown on the Car's odometer, multiplied by the per mile rate specified on the Rental Record.

"(ii) If you buy fuel during the rental, this charge will be the per gallon rate specified on the Rental Record multiplied by the number of gallons required to refill the Car's fuel tank, determined by subtracting the capacity of the portion of the tank that is full, as indicated by the fuel gauge, from the manufacturer's specified capacity for the Car.

"(b) If you choose to purchase fuel from Hertz at the commencement of your rental, as shown by Your initialing the Rental Record, you will be charged the amount shown on the Rental Record for that purchase. IF YOU CHOOSE THIS OPTION YOU WILL NOT INCUR AN ADDITIONAL FUEL AND SERVICE CHARGE, BUT YOU WILL NOT RECEIVE ANY CREDIT FOR FUEL LEFT IN THE CAR AT THE TIME OF RETURN." (Capitalization in original.)

[3]The alleged equivalency is apparently based on the assumption that the rented vehicle travels 19 miles per gallon of fuel, as $.168 multiplied by 19 equals $3.19. Presumably, the per mile rate varies so that it correctly corresponds with the fuel consumption of the rented vehicle, but this is not shown by the record.

neither does the renter receive credit for fuel left in the car at the time of return.

In sum, a fuel service charge is imposed only on those customers who reject the fuel purchase option and fail to return the car with a full tank; although, the complaint asserts, customers who elect the fuel purchase option invariably end up making a "gift" to Hertz because it is virtually impossible to return a car with a completely empty tank.

The amended complaint alleges four causes of action: (1) an unfair, unlawful or fraudulent business practice in violation of the UCL; (2) money had and received on the basis of an "unconscionable and adhesive contract" imposing "an excessive and punitive charge," which contract is "void as a matter of law"; (3) restitution; and (4) violation of the Consumers Legal Remedies Act, Civil Code section 1750 et seq.[4]

The trial court sustained the demurrer on the basis of its determination that paragraph 8 of the rental agreement clearly described the options available to customers and that the fuel service charge imposed if the customer chose not to purchase fuel from Hertz and returned the car with less than a full tank was fair. As stated by the court in the order sustaining the demurrer, the rental agreement "unambiguously explains the various refueling options available to the renter. The fuel and service charge is not a penalty, but an option, and is not unconscionable." The trial court evidently concluded that this determination effectively disposed as well of appellant's remaining causes of action, which it did not discuss.

## II. Discussion

### A. Standard of Review—Demurrer.

For purposes of ruling on a demurrer the allegations of the complaint must be treated as having been admitted. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26 [77 Cal.Rptr.2d 709, 960 P.2d 513], 38; *Call v. Kezirian* (1982) 135 Cal.App.3d 189, 195 [185 Cal.Rptr. 103]; *Custodio v. Bauer* (1967) 251 Cal.App.2d 303 [59 Cal.Rptr. 463, 27 A.L.R.3d 884].) "It is axiomatic that if there is a reasonable possibility that a defect in the complaint can be cured by amendment or that the pleading liberally construed can state a cause of action, a demurrer should not be sustained without leave to amend. [Citations.]" (*Minsky v. City of Los*

---

[4]The original complaint, which contained five causes action, differed in that it included causes of action for breach of the covenant of good faith and fair dealing and unjust enrichment, and did not allege a cause of action for restitution.

*Angeles* (1974) 11 Cal.3d 113 [113 Cal.Rptr. 102, 520 P.2d 726], 118.) However, while " '[a] demurrer admits all material and issuable facts properly pleaded . . . it does not admit contentions, deductions or conclusions of fact or law alleged therein. [Citations.]' (*Daar* v. *Yellow Cab Co.* (1967) 67 Cal.2d 695, 713 [63 Cal.Rptr. 724, 433 P.2d 732].) 'In determining whether or not the complaint is sufficient . . . to constitute a cause of action, the rule is, that if upon a consideration of all the facts stated it appears that the plaintiff is entitled to any relief at the hands of the court against the defendants, the complaint will be held good, although the facts may not be clearly stated, or may be intermingled with a statement of other facts irrelevant to the cause of action shown, or although the plaintiff may demand relief to which he is not entitled under the facts alleged.' (*Matteson* v. *Wagoner* (1905) 147 Cal. 739, 742 [82 P. 436].) In other words, 'plaintiff need only plead facts showing that he may be entitled to some relief [citation].' (*Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216].)" (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 572 [108 Cal.Rptr. 480, 510 P.2d 1032]; accord, *Quelimane Co. v. Stewart Title Guaranty Co., supra*, 19 Cal.4th at p. 38; *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125 [271 Cal.Rptr. 146, 793 P.2d 479, 16 A.L.R.5th 903].)

■ An appeal from a judgment entered after the sustaining of a demurrer without leave to amend presents anew the question whether " ' "it appears that the plaintiff is entitled to any relief at the hands of the court against the defendants," ' " which is "a pure question of law." (*CAMSI IV v. Hunter Technology Corp.* (1991) 230 Cal.App.3d 1525, 1530 [282 Cal.Rptr. 80], quoting *Gruenberg v. Aetna Ins. Co., supra*, 9 Cal.3d at p. 572.) We construe the allegations of the complaint liberally " 'with a view to substantial justice between the parties.' " (9 Cal.3d at p. 573, fn. 4, citing, inter alia, Code Civ. Proc., § 452.) However, while we must consider whether the complaint might state a cause of action if a defect could reasonably be cured by amendment, and reverse the judgment of dismissal if the defect can be cured, "[t]he plaintiff bears the burden of demonstrating a reasonable possibility to cure any defect by amendment. [Citations.] A trial court abuses its discretion if it sustains a demurrer without leave to amend when the plaintiff shows a reasonable possibility to cure any defect by amendment. [Citations.] If the plaintiff cannot show an abuse of discretion, the trial court's order sustaining the demurrer without leave to amend must be affirmed. [Citation.]" (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494 [82 Cal.Rptr.2d 368], 1501.)

## B. *Unfair Competition Law.*

■ Appellant's first cause of action rests on section 17200 of the Business and Professions Code, the core provision of the UCL. The remedies

available under this law, which are generally limited to injunctive relief and restitution, are "cumulative . . . to the remedies or penalties available under all other laws of this state." (§ 17205.) "In contrast to its limited remedies, the unfair competition law's scope is broad. Unlike the Unfair Practices Act [(Bus. & Prof. Code, § 17000 et seq.)] it does not proscribe specific practices. Rather, as relevant here, it defines 'unfair competition' to include 'any unlawful, unfair or fraudulent business act or practice.' (§ 17200.) Its coverage is 'sweeping, embracing " 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " ' (*Rubin* v. *Green* (1993) 4 Cal.4th 1187, 1200 [17 Cal.Rptr.2d 828, 847 P.2d 1044], quoting *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 113 [101 Cal.Rptr. 745, 496 P.2d 817].) It governs 'anti-competitive business practices' as well as injuries to consumers, and has as a major purpose 'the preservation of fair business competition.' (*Barquis* v. *Merchants Collection Assn., supra*, 7 Cal.3d at p. 110; see also *People* v. *McKale* (1979) 25 Cal.3d 626, 631-632 [159 Cal.Rptr. 811, 602 P.2d 731]; *People* ex rel. *Mosk* v. *National Research Co. of Cal.* (1962) 201 Cal.App.2d 765, 771 [20 Cal.Rptr. 516].) By proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable. (*State Farm Fire & Casualty Co.* v. *Superior Court* (1996) 45 Cal.App.4th 1093, 1103 [53 Cal.Rptr.2d 229], citing *Farmers Ins. Exchange* v. *Superior Court* [(1992)] 2 Cal.4th [377,] 383 [6 Cal.Rptr.2d 487, 826 P.2d 730].)

"However, the law does more than just borrow. The statutory language referring to 'any unlawful, unfair *or* fraudulent' practice (italics added) makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law. 'Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent. "In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." ' (*Podolsky* v. *First Healthcare Corp.* (1996) 50 Cal.App.4th 632, 647 [58 Cal.Rptr.2d 89], quoting *State Farm Fire & Casualty Co.* v. *Superior Court, supra*, 45 Cal.App.4th at p. 1102.)" (*Cel-Tech Communications, Inc.* v. *Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech*) fn. omitted.)

The recent opinion in *Cel-Tech* explains why the UCL has such a broad scope: " '[T]he Legislature . . . intended by this sweeping language to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur. Indeed, . . . the section was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals

to deal with the innumerable " 'new schemes which the fertility of man's invention would contrive.' " (*American Philatelic Soc.* v. *Claibourne* (1935) 3 Cal.2d 689, 698 [46 P.2d 135].) As the *Claibourne* court observed: "When a scheme is evolved which on its face violates the fundamental rules of honesty and fair dealing, a court of equity is not impotent to frustrate its consummation because the scheme is an original one. . . ." (3 Cal.2d at pp. 698-699 . . . ; accord, *FTC* v. *The Sperry & Hutchinson Co.* (1972) 405 U.S. 233, 240 [31 L.Ed.2d 170, 177, 92 S.Ct. 898].) With respect to "unlawful" or "unfair" business practices, [former] section 3369 [today section 17200] specifically grants our courts that power. [¶] In permitting the restraining of all "unfair" business practices, [former] section 3369 [today section 17200] undeniably establishes only a wide standard to guide courts of equity; as noted above, given the creative nature of the scheming mind, the Legislature evidently concluded that a less inclusive standard would not be adequate.' (*Barquis* v. *Merchants Collection Assn., supra*, 7 Cal.3d at pp. 111-112, fn. omitted.) '[I]t would be impossible to draft in advance detailed plans and specifications of all acts and conduct to be prohibited [citations], since unfair or fraudulent business practices may run the gamut of human ingenuity and chicanery.' (*People* ex rel. *Mosk* v. *National Research Co. of Cal., supra*, 201 Cal.App.2d 765 at p. 772.)" (*Cel-Tech, supra*, 20 Cal.4th at p. 181.)

Despite the sweeping language of the UCL, *Cel-Tech* goes on to explain, the scope of a court's power under that law "is not unlimited." (*Cel-Tech, supra,* 20 Cal.4th at p. 182.) "Courts may not simply impose their own notions of the day as to what is fair or unfair. Specific legislation may limit the judiciary's power to declare conduct unfair. If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." (*Ibid.*)

The trial court found that Civil Code section 1936, subdivision (m)(2), provides such a "safe harbor," because it specifically authorizes the challenged business practices.

C. *Civil Code Section 1936, Subdivision (m)(2).*

■ Civil Code section 1936 was primarily designed to protect consumers against rental car company overcharges for collision damage waivers— defined in the statute as "a rental company's agreement not to hold a renter liable for all or any portion of any damage or loss related to the rented

vehicle, . . . or any storage, impound, towing, or administrative charges" (Civ. Code, § 1936, subd. (a)(4))—and for the cost of repairing cars damaged during a rental.[5] The statute does, however, touch on a variety of other rental car practices. Subdivision (m)(1) of section 1936 provides that the only charges a rental car company may mandate as a condition of leasing the vehicle are the rental rate, taxes, and a mileage charge, if any. However, subdivision (m)(2) of section 1936—the provision with which we are here primarily concerned—does permit a rental car company to impose additional charges for optional services if the renter knows the charge is avoidable. In material part, subdivision (m)(2) provides as follows: "In addition to the rental rate, taxes and mileage charge, if any, a rental company may charge for an item or service provided in connection with a particular rental transaction *if the renter could have avoided incurring the charge by choosing not to obtain or utilize the optional item or service.* Items and services for which the rental company may impose an additional charge, include, but are not limited to . . . *charges for refueling the vehicle at the conclusion of the rental transaction in the event the renter did not return the vehicle with as much fuel as was in the fuel tank at the beginning of the rental.* . . ." (Italics added.)

The basis of Hertz's demurrer, and the heart of its argument on this appeal, is that the admonitions set forth in paragraph 8 of the rental agreement unambiguously advise customers how to avoid incurring a fuel service charge. Paragraph 8 informs renters (1) that "IF YOU DO NOT PURCHASE FUEL FROM HERTZ AT THE COMMENCEMENT OF YOUR RENTAL AND YOU RETURN THE CAR WITH LESS FUEL THAN WAS IN IT WHEN YOU RECEIVED IT, Hertz will charge you for fuel and the service of refueling," and (2) that "[i]f you choose to purchase fuel from Hertz at the commencement of your rental . . . YOU WILL NOT INCUR AN ADDITIONAL FUEL AND SERVICE CHARGE, BUT YOU WILL NOT RECEIVE ANY CREDIT FOR FUEL LEFT IN THE CAR AT THE TIME OF RETURN."

Hertz maintains that because the foregoing language clearly advises renters that a fuel service charge can be avoided by electing not to purchase fuel from Hertz and returning the car with a full tank, the amount of the fuel

---

[5]The Attorney General, who sponsored the legislation that became Civil Code section 1936, stated during the legislative process that the measure was necessitated by our decision in *Truta v. Avis Rent A Car System* (1987) 193 Cal.App.3d 802 [238 Cal.Rptr. 806], in which, among other things, we rejected the argument that collision damage waiver fees violate the prohibition in Insurance Code former section 1852 against excessive rates. According to the Attorney General "the *Truta* ruling necessitates the enactment of AB 3006. Clearly, the Department of Insurance will not be regulating CDW. Consequently . . . it is imperative that some effort be made to provide the protection to which consumers of CDW are entitled." (Sen. Com. on Judiciary, Rep. on Assem. Bill No. 3006 (1987-1988 Reg.Sess.) as amended May 19, 1988, p. 7.)

service charge it imposes on renters who make this election but bring the car back with less than a full tank cannot be judicially questioned.

Appellant's primary response to this contention is that Hertz's rental agreement does not genuinely provide a means of avoiding a fuel service charge, "because it merely enables the consumer to eliminate the risk of being penalized with an excessive fueling penalty in exchange for assuming the risk of being effectively penalized by receiving no credit for fuel purchased but not used by the consumer." According to the complaint, a consumer who elects to purchase fuel from Hertz at the commencement of the rental, and thereby avoid its excessive fuel charge, but returns the car with a half-full tank "effectively pays Hertz two times the prevailing average retail price for each gallon of fuel actually used by the consumer." No matter which alternative the customer chooses, the complaint avers, Hertz receives "an enormous windfall."

The trouble with this argument, Hertz points out, is that it conveniently ignores the ability of the consumer to reject the fuel purchase option and bring the car back with a full tank, in which case no fuel service charge is imposed and the renter makes no "gift" to Hertz of uncredited fuel left in the tank. We are unimpressed with appellant's answer to this point, which is that renters who intended to return the car with a full tank are often prevented from doing so by exigencies they did not anticipate, such as traffic delays. The quotidian problems appellant has in mind are not, however, truly unforeseeable. Traffic delays have become an unhappy feature of everyday life, and it is reasonable to anticipate many other events that might deprive a renter of the time needed to refuel. Renters who accept the responsibility to refill the tank must be deemed to have considered the obvious possibility that, if they do not set aside the necessary time and take other precautions, traffic congestion or other obstacles may prevent them from doing so and in that event, as stated in the rental agreement, they will sustain a fuel service charge. The risk a renter may be unable to refuel the car before returning it and suffer a fuel service charge is, in other words, an element of the bargain. We reject appellant's theory that because some renters may fail to take the precautions necessary to eliminate the risk, or precautions taken may not succeed, fuel service charges cannot always be avoided, and because they cannot always be avoided the charges are not authorized by Civil Code section 1936, subdivision (m)(2). Fuel service charges imposed under paragraph 8 of Hertz's rental agreement are in our view avoidable within the meaning of subdivision (m)(2) and therefore lawful.

This is not, however, the end of the matter, as the complaint advances two UCL claims that are not disposed of by our finding that Hertz's fuel service

charge is lawful under Civil Code section 1936, subdivision (m)(2). The first is that the *amount* of Hertz's fuel service charge is grossly inflated and "unfair" under the UCL, and that even if the fuel service charge is deemed avoidable, and therefore authorized by subdivision (m)(2), the statute does not "specifically authorize *exorbitant* fees or declare *that* practice to be lawful." (Italics added.) The second UCL claim we must proceed to examine is that Hertz misleads its customers by deceptively concealing or obscuring the amount of its fuel service charge, and that this conduct is both "unfair" and "fraudulent" under the UCL. We conclude that the first claim does not state a cause of action under the UCL but the second does.

### D. *The Claim That the Amount of the Fuel Service Charge Is an Unfair Business Practice Does Not State a Cause of Action Under the UCL.*

■ Hertz's answer to appellant's claim that the amount of its fuel service charge is exorbitant and constitutes an unfair business practice under the UCL is that Civil Code section 1936, subdivision (m)(2)'s failure to (1) specify or limit the amount of the refueling service charge that may be imposed, considered in the light of other provisions of section 1936 which do impose limits on the dollar amount a renter may be charged for costs related to physical damage to the vehicle,[6] or (2) confine the amount of such costs that may be passed on to the renter of the rental car company's actual costs,[7] reflects a legislative intention to let the market, not the courts, determine the reasonableness of avoidable charges for optional services.

Hertz's argument that Civil Code section 1936, subdivision (m)(2) constitutes a safe harbor barring judicial inquiry into the fairness of refueling service charges rests heavily on the recent opinion of Division Three of this court in *Lazar v. Hertz Corp., supra,* 69 Cal.App.4th 1494. *Lazar* was a class action against four rental car companies—Hertz Corporation, Budget Rent a

---

[6]For example, subdivision (b)(4) of Civil Code section 1936 provides that for physical damage to the vehicle and the loss of use thereof, the renter may be charged "up to a total of five hundred dollars ($500) resulting from vandalism unrelated to the theft of the rented vehicle." Similarly, subdivision (c)(7) of Civil Code section 1936 provides that any "administrative charge" relating to the cost of appraisal and other costs and expenses incident to the damage, loss, loss of use, repair, or replacement of a rented vehicle "shall not exceed (A) fifty dollars ($50) if the total estimated cost for parts and labor is more than one hundred dollars ($100) up to and including five hundred dollars ($500), (B) one hundred dollars ($100) if the total estimated cost for parts and labor exceeds five hundred dollars ($500) up to and including one thousand five hundred dollars ($1,500), and (C) one hundred fifty dollars ($150) if the total estimated cost of parts and labor exceeds one thousand five hundred dollars ($1,500). No administrative charge shall be imposed if the total estimated cost of parts and labor is one hundred dollars ($100) or less."

[7]For example, subdivision (c)(6) of Civil Code section 1936 provides that renters may be charged no more than "[a]ctual charges for towing, storage, and impound fees paid by the rental company."

Car Corporation, National Car Rental Systems, Inc., and Alamo Rent-A-Car, Inc.—alleging that they either wrongfully refused to rent automobiles to persons under age 25 or unreasonably restricted rentals to such persons through the imposition of surcharges. The plaintiff pleaded causes of action for age discrimination in violation of the Unruh Civil Rights Act (Civ. Code, § 51) as well as unfair competition under the UCL against all four defendants, and unfair business practices by the companies that rented to persons under age 25 but imposed a surcharge on such persons. The trial court sustained defendants' demurrer without leave to amend as to the Unruh Civil Rights Act and unfair competition causes of action based on age discrimination, and granted the motion for summary adjudication filed by the defendants that imposed an age-based surcharge. The Court of Appeal affirmed.

The issue in *Lazar* most pertinent to that presented in this case is the validity of the surcharge. The plaintiff in *Lazar* argued not that the surcharge was itself illegal but, as here, that the *amount* charged was unreasonable. (*Lazar v. Hertz Corp., supra*, 69 Cal.App.4th at p. 1506.) As to this claim, only two causes of action were before the Court of Appeal: (1) an Unruh Civil Rights Act cause of action for age discrimination, as to which the trial court sustained Hertz's demurrer without leave to amend, and (2) a UCL violation cause of action, as to which the trial court granted Budget and Alamo's motion for summary adjudication. (*Ibid.*) Before granting Budget and Alamo summary adjudication, the trial court had overruled their demurrer to this cause of action; therefore, in ruling in their favor as to the fairness of the charges, the trial court went beyond the pleadings and reviewed evidence proffered by the parties. (*Id.* at p. 1507.)

Budget and Alamo claimed the plaintiff's discovery responses were devoid of evidence that the amount of the surcharges they assessed against renters under age 25 were unreasonably high. The plaintiff claimed he was not obliged to come forward with evidence of unfair surcharges in order to survive a summary adjudication motion. The Court of Appeal disagreed. "On a motion for summary adjudication, a defendant may rely on a plaintiff's factually inadequate discovery answers to seek summary adjudication of a particular cause of action. If plaintiff fails to adduce evidence during discovery to support the factual allegations of his or her complaint, the burden shifts to the plaintiff and the motion may be granted if the plaintiff does not set forth specific facts that show a triable issue of material fact. [Citation.] Lazar has not put forth any evidence in the trial court or on appeal in support of his claim that the surcharge is unreasonably high or unreasonably imposed on younger drivers such that it constitutes an unfair business practice. As he failed to meet his burden, Budget and Alamo were entitled to summary

adjudication in their favor as a matter of law. Thus, the trial court properly granted Budget and Alamo summary adjudication on the unreasonable surcharge cause of action alleging a violation of the UCL. [Citation.]" (*Lazar v. Hertz Corp., supra,* 69 Cal.App.4th at p. 1508.)

Significantly, the foregoing analysis does not rely on the legislative authorization of age-based surcharges. Subdivision (m)(2) of Civil Code section 1936 authorizes not only refueling service charges (and charges for other optional items and services) but additionally provides that "[a] rental company also may impose an additional charge based on reasonable age criteria established by the rental company." Unlike fuel service charges, an age-based surcharge need not be avoidable; however, as in the case of avoidable charges, subdivision (m)(2) says nothing about the amount of any age-based surcharge.

The *Lazar* court *did* rely on subdivision (m)(2) of Civil Code section 1936, however, when it affirmed the sustaining of the demurrer to the cause of action for Unruh Civil Rights Act violations based on allegations of unreasonable surcharges. The court observed that the plaintiff "argues as if the Legislature requires the *amount of the surcharge* to be reasonable, when in fact [subdivision (m)(2)] requires only that the age *limitation for the surcharge* be reasonable. . . . To the extent that he would have this court read a reasonableness requirement into the surcharge amount provision, we decline to do so." (*Lazar v. Hertz Corp., supra*, 69 Cal.App.4th at p. 1508, italics in original.) Pointing to provisions of section 1936 other than subdivision (m)(2), in which the Legislature set forth specific dollar or actual cost limitations that vehicle rental agreements may not exceed, the *Lazar* court reasoned that "[b]y implication, the Legislature's omission is significant, suggesting that it intended a different purpose—that is, *not* to impose such a limitation but to leave this amount to the business judgment of the vehicle rental companies. [Citations.] We may not substitute our judgment for that of the Legislature when it appears that that body has deliberately chosen not to impose a monetary limitation. [Citation.]" (69 Cal.App.4th at pp. 1508-1509, italics in original.) Viewing the question presented as one of economic policy, the court concluded that "the [Unruh Civil Rights] Act does not allow us 'to engage in complex economic regulation under the guise of judicial decisionmaking.' [Citations.] It is the Legislature's function, not ours, to determine the wisdom of economic policy. Judicial intervention in such economic issues is improper. [Citations.]" (*Id.* at p. 1509)

Finally, the *Lazar* court rejected the appellant's alternative argument "that the issue of reasonableness is a factual one requiring a trial, effectively precluding resolution on demurrer." The court observed that "[Unruh Civil

Rights] Act issues are often decided on demurrer or motion for summary judgment when the business practice appears to be valid on its face as bearing a reasonable relation to appropriate commercial objectives for a public enterprise. [Citation.] The issue before us is a purely legal one. . . . As the proper interpretation of section 1936 precludes courts from interfering in economic matters under the guise of an [Unruh Civil Rights] Act violation, then as a matter of law there was no violation of the [Unruh Civil Rights] Act." (*Lazar v. Hertz Corp., supra*, 69 Cal.App.4th at p. 1509, citing *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1165 [278 Cal.Rptr. 614, 805 P.2d 873], an Unruh Civil Rights Act case.)

*Lazar* does not dispositively resolve the question whether a court can decide as a matter of law, and therefore on demurrer, whether charges for optional services that may lawfully be imposed under Civil Code section 1936, subdivision (m)(2) are not so exorbitant as to constitute an unfair business practice under the UCL, because in that case the issue did not involve an optional service and was not presented on demurrer, but on a motion for summary adjudication, in connection with which the trial court considered evidence presented by the parties, not just the pleadings. Indeed, as noted, the trial court previously rejected Hertz's effort to dispose of that issue by way of a demurrer. The *Lazar* court did not approve the use of a demurrer to decide whether the age-based surcharge was an unfair business practice *under the UCL*, but only to decide whether the surcharge passed muster *under the Unruh Civil Rights Act.*[8]

On balance, however, we conclude that the reasoning employed by the *Lazar* court to uphold the sustaining of the demurrer as to the Unruh Civil Rights Act claim is not significantly different from that which must be employed under the UCL, and should be followed. Courts are no more empowered "to engage in complex economic regulation under the guise of judicial decisionmaking" (*Harris v. Capital Growth Investors XIV, supra*, 52 Cal.3d at p. 1168) under the UCL than they are under the Unruh Civil Rights Act. ▮ In other words, where the allegedly unfair business practice has been authorized by the Legislature, no factual or equitable inquiry need be made, as the court can decide the matter entirely on the law. ▮ We conclude that, by authorizing avoidable fuel service charges, Civil Code section 1936, subdivision (m)(2) insulates the reasonableness of such

---

[8]Though some of the cases the *Lazar* court relied upon in making that decision were UCL cases (*Wolfe v. State Farm Fire & Casualty Ins. Co.* (1996) 46 Cal.App.4th 554 [53 Cal.Rptr.2d 878]; *California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205 [27 Cal.Rptr.2d 396]; *Korens v. R. W. Zukin Corp.* (1989) 212 Cal.App.3d 1054 [261 Cal.Rptr. 137]), only one (*Wolfe v. State Farm & Casualty Ins. Co.*) was decided on the basis of a demurrer.

charges from judicial scrutiny.[9] We base this conclusion not so much on *Lazar* as the Supreme Court's subsequent opinion in *Cel-Tech, supra*, 20 Cal.4th 163.

*Cel-Tech* was an action by sellers of cellular telephones against a company that sold such phones below cost to gain subscribers for its cellular service. The plaintiffs alleged several causes of action, including that the defendant violated the Unfair Practices Act (Bus. & Prof. Code, § 17000 et seq.) and the UCL. The trial court found there was no violation of the Unfair Practices Act because the defendant merely intended to compete with a third party, not to harm the plaintiffs. For this reason, it ruled that the UCL action (and other causes of action) necessarily failed. The Court of Appeal reversed as to the cause of action under the UCL and affirmed as to the other causes of action. The Court of Appeal found that the defendant's activity might have violated the UCL even though it did not violate the Unfair Practices Act and remanded the matter for retrial on that cause of action. (*Cel-Tech, supra*, 20 Cal.4th at pp. 169-170.)

The Supreme Court affirmed the judgment of the Court of Appeal, explaining that "a practice may be deemed unfair even if not specifically proscribed by some other law." (*Cel-Tech, supra*, 20 Cal.4th at p. 180.) *Cel-Tech* states that the rule that a plaintiff may not "plead around" an "absolute bar to relief" simply by recasting the action as one for relief under the UCL "does not, however, prohibit an action under the unfair competition law merely because some other statute on the subject does not, itself, provide

---

[9]Partly for this reason, we reject appellant's claim that the fuel service charge is unconscionable. Not only does this charge fail to "shock the conscience" (*California Grocers Assn. v. Bank of America, supra*, 22 Cal.App.4th at p. 215), appellant's claim does not even meet the less stringent standard of *A & M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473, 486 [186 Cal.Rptr. 114, 38 A.L.R.4th 1], which stated that the doctrine of unconscionability " 'has generally been recognized to include an *absence of meaningful choice* on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' " (Quoting *Williams v. Walker-Thomas Furniture Company* (D.C. Cir. 1965) 350 F.2d 445, 449 [121 App.D.C. 315, 18 A.L.R.3d 1297], italics added; disagreed with by *American Software, Inc. v. Ali* (1996) 46 Cal.App.4th 1386, 1391 [54 Cal.Rptr.2d 477]; declined to follow by *California Grocers Assn., Inc. v. Bank of America, supra*, 22 Cal.App.4th at pp. 213-214; see also *Dean Witter Reynolds, Inc. v. Superior Court* (1989) 211 Cal.App.3d 758, 767 [259 Cal.Rptr. 789].) It is enough to reiterate that Hertz's customers have a "meaningful choice," because the rental agreement adequately informs renters that if they reject the fuel purchase option and return the rented car with a full tank they will pay no fuel service charge. Because we find as a matter of law that the fuel service charge was not unconscionable, it is unnecessary to address appellant's related claims that the fuel service charge violates Civil Code sections 1670.5, subdivision (a) (relating to the enforceability of an unconscionable contract or clause thereof), 1670.5, subdivision (b) (affording the parties an evidentiary hearing on a claim of unconscionability), 1671 (invalidating certain liquidated damages provisions), and 1770, subdivision (a)(19) (declaring that insertion of an unconscionable provision in a contract constitutes "an unfair method of competition and unfair or deceptive act or practice").

for the action or prohibit the challenged conduct. *To forestall an action under the unfair competition law, another provision must actually 'bar' the action or clearly permit the conduct.* There is a difference between (1) not making an activity unlawful, and (2) making that activity lawful. For example, Penal Code section 211, which defines robbery, does not make murder unlawful. Most assuredly, however, that section does not also make murder lawful. Acts that the Legislature has determined to be lawful may not form the basis for an action under the unfair competition law, but *acts may, if otherwise unfair, be challenged under the unfair competition law even if the Legislature failed to proscribe them in some other provision. [¶] . . . If [in another statute], the Legislature considered certain activity in certain circumstances and determined it to be lawful, courts may not override that determination under the guise of the unfair competition law. However, if the Legislature did not consider that activity in those circumstances, the failure to proscribe it in a specific provision does not prevent a judicial determination that it is unfair under the unfair competition law."* (*Cel-Tech, supra,* 20 Cal.4th at pp. 182-183, italics added.)

 The foregoing guidelines compel us to conclude that subdivision (m)(2) of Civil Code section 1936 provides Hertz a safe harbor against appellant's claim that the amount of Hertz's fuel service charge is unfair within the meaning of the UCL.

Hertz argues that the explicit authorization of fuel service charges and charges for other optional services,[10] coupled with the failure to specify any limit on such charges and the concomitant limitation of certain other charges, provides a sufficient basis upon which to conclude that Civil Code section 1936 provides car rental companies a safe harbor from unfairness claims under the UCL related to the amount of charges for optional services. We agree that, having considered the charges imposed by rental car companies on their customers, the failure of the Legislature to explicitly limit the amounts such companies may charge for optional services—specifically including "charges for refueling the vehicle at the conclusion of the rental transaction in the event the renter did not return the vehicle with as much fuel as was in the fuel tank at the beginning of the rental" (Civ. Code, § 1936, subd. (m)(2)—as it did limit other charges such companies may charge, can reasonably be thought to reflect a legislative intention to permit such avoidable charges to be regulated only by free market forces. But there

---

[10]The other charges referred to in subdivision (m)(2) of Civil Code section 1936 "include, but are not limited to, optional insurance and accessories requested by the renter, service charges incident to the renter's optional return of the vehicle to a location other than the location where the vehicle was hired or leased . . . [and] charge[s] based on reasonable age criteria established by the rental company."

is an affirmative reason to conclude that the amount of charges imposed for optional services are immune from scrutiny under the UCL. The logic of subdivision (m)(2) is that consumers fully informed of the avoidability of an optional service charge would not pay charges they knew they could avoid unless they considered the service worth the amount charged. Consumers, and the rental car companies that respond to their needs, are for this reason better positioned than the courts to determine the reasonableness of an avoidable charge for an optional service.

E. *The Claim That Hertz Unfairly and Fraudulently Conceals or Obscures the Fuel Service Charge States a Cause of Action Under the UCL.*

As indicated, appellant's UCL claims challenge not only the *amount* of Hertz's fuel service charge, but as well the allegedly deceptive *manner* in which Hertz induces its customers to incur the charge, which is independently claimed to constitute an unfair and fraudulent business practice under the UCL. According to the complaint, the practice consists of (1) "purposefully crafting the refueling formulas in the Rental Agreement so that they are incomprehensible to plaintiff and each Class member, especially given the circumstances of the typical four-minute rental transaction"; and (2) "purposefully not including Hertz's actual price per gallon refueling charge in the Rental Agreement, thereby making it even less apparent to the plaintiff and each member of the Class."

Hertz answers that pleading such "separate claims" under the "unfair" and fraudulent prongs of Business and Professions Code section 17200 cannot save the complaint because "[t]he law is clear that, where the legislature has enacted a statute that expressly governs the conduct at issue, and the defendant's conduct is *lawful* under that statute, a violation of *any* prong of section 17200 cannot be established." (Original italics.) The defect in this argument is that the conduct we found lawful under Civil Code section 1936, subdivision (m)(2), which relates solely to the imposition of an avoidable charge for an optional service and the amount of that charge, is very different from the allegedly deceptive conduct appellant independently challenges under the UCL, which relates to confusing and misleading portions of the rental agreement and rental record which purport to disclose and explain the charge. The cases Hertz relies upon—*Cel-Tech, supra,* 20 Cal.4th 163 at page 182; *Lazar v. Hertz Corp., supra,* 69 Cal.App.4th 1494 at pages 1504-1505; *Hobby Industry Assn. of America, Inc. v. Younger* (1980) 101 Cal.App.3d 358, 369-370 [161 Cal.Rptr. 601]—are all inapposite, as the situations they refer to are ones in which the conduct found to have been lawful was precisely the same as that claimed also to be "unfair" and "fraudulent."

Authorization of avoidable charges for optional services hardly amounts to permission to mislead customers about such charges. On the contrary,

deception calculated to induce customers to subject themselves to an avoidable charge is inimical to the very concept of avoidability. The failure of a rental car company to make it clear to customers that an avoidable charge is considerably higher than the retail rate for an item or service, which in the absence of contrary information many would expect to apply, would doubtless encourage some and perhaps many customers to incur a fuel service charge they could and would otherwise avoid, which it was clearly not the purpose of Civil Code section 1936, subdivision (m)(2) to allow. The cost of the fuel needed to refill the tank in the event Hertz is required to do so is therefore highly relevant to the renter's decision whether to accept the responsibility to refuel and actually do so.

The fact that the per gallon rate is not disclosed in the rental agreement but only in the rental record, a small and hard-to-read document consisting for the most part of indecipherable abbreviations, may be indicative of an intent to conceal this important information. The need for a separate document is unclear to begin with.[11] According to appellant, many renters assume the rental record merely affirms acceptance of the provisions of the rental agreement and initial it without reading it. We do not know whether this is so. But even the sedulous renter who takes the time during the typical four-minute rental transaction[12] to closely read the rental record cannot learn from it whether the per mile rate or per gallon rate applies and the difference, if any, between the two. For example, the standard rental record provided appellant employs facially incomprehensible abbreviations to identify optional services that are available, which are listed in a column. Next to each abbreviation is the word "declined." At the end of the list there appears the statement that "fuel & svc charges apply." Next to this statement the Roman numeral IX inexplicably appears in parentheses and after that the notation: ".168 MI $3.19 GL" which presumably means appellant would be subject to a per mile rate of $.168 or a per gallon rate of $3.19.

Hertz customers are provided no clue that the per mile rate and the per gallon rate produce substantially the same result.[13] The use of alternative rates implies they produce different results. For a renter to realize that they

---

[11]Counsel for Hertz maintains that a separate document is necessary to indicate whether the renter has elected any optional services and, if so, to state the cost thereof, and also because the per gallon rate fluctuates with changes in the price of fuel and can more easily be set forth in a computer-generated document rather than a preprinted form, like the rental agreement. These claims are, however, inadequately substantiated by the record before us.

[12]As noted, the complaint alleges, and for present purposes we are obliged to assume, that the "average" car rental transaction is completed in four minutes. In *People v. Dollar Rent-A-Car Systems, Inc.* (1989) 211 Cal.App.3d 119, 126 [259 Cal.Rptr. 191], which addressed UCL claims similar to those made here, the court accepted without discussion the claim that the "average" car rental transaction lasts four minutes.

[13]For example, assume renters A and B each returned cars that were five gallons short of a full tank and that each car traveled 19 miles per gallon of fuel (see, *ante*, fn. 3). Renter A, who

actually produce more or less the same result, he or she would have understood not only the different manner in which the two rates are employed (one is multiplied by miles traveled, the other by gallons of fuel needed) but also the number of miles the rented vehicle travels on a gallon of gas (see discussion, *ante*, at fn. 3), which, so far as the record shows, is not disclosed in any document Hertz provides its customers. Given the inexplicable use of two different rates to calculate the fuel service charge, and the needlessly complex language in the rental agreement relating to the application of those rates, it would not be surprising if many renters erroneously assumed not only that the per mile rate applies but that it produces a lower fuel service charge, which could be costly mistakes.

The rental agreement, which purports to explain the difference between the mileage rate and the per gallon rate, is altogether unedifying. Paragraph 8 states that whether the per mile or per gallon rate applies depends upon whether the customer purchases fuel during the rental. If the customer does not buy fuel during the rental, he or she is charged the number of miles driven, as shown by the odometer, "multiplied by the per mile rate specified on the Rental Record." If fuel was purchased during the rental, the customer is charged "the per gallon rate specified on the Rental Record multiplied by the number of gallons required to refill the Car's fuel tank . . . ." The rental agreement does not, however, explain, nor was counsel for Hertz able to explain, why the fuel service charge is calculated one way if the customer purchased fuel during the rental and another if he or she did not. If two customers each return a car five gallons short of a full tank, it is not readily apparent why the fact that one purchased fuel during the rental and the other did not justifies the use of different formulas. We appreciate that it would be unfair to apply the per mile rate to the renter who purchased fuel during the rental, because he or she would receive no credit for the expense of refueling; but this does not explain the need to apply the per mile rate to the renter who did not refuel. Although on the record before us we cannot be certain, it appears that application of the per mile rate in the latter situation, which would result in a charge virtually identical to that which would result from application of the per gallon rate, serves no purpose other than perhaps to suggest (erroneously) that it would result in a lesser charge.

The record before us also does not disclose why the per gallon rate—the most useful information to customers who must decide whether to accept the responsibility to refill the tank and, if so, whether to actually do so—is not

purchased no fuel during the rental, could only have traveled about 95 miles. Ninety-five times the per mile rate of $.168 equals $15.96. Renter B, who traveled a long distance requiring him to purchase fuel during the rental, would therefore be subject to the per gallon rate of $3.19. Thus, he would be required to pay almost the identical amount (5 x $3.19 = $15.95) for the five gallons of gas needed to refill the tank of his car.

forthrightly provided. The confusing provisions of the rental agreement and rental record just described, which are very different from the much clearer capitalized language in the agreement describing the conduct that will result in a fuel service charge, appear to violate fundamental rules of honesty and fair dealing. The deceptive practice the complaint describes is precisely the type the UCL was designed to address. "The independent 'unfairness' prong of the UC[L] is 'intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud. [Citation.]" (*Podolsky v. First Healthcare Corp, supra,* 50 Cal.App.4th at p. 647.) It has been said that a business practice may be "unfair" within the meaning of the UCL even if it is not "unlawful"; it is enough if the conduct in question " ' "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." [Citation.]' " (*Ibid.,* quoting *State Farm Fire & Casualty Co. v. Superior Court, supra,* 45 Cal.App.4th 1093 at p. 1104, in turn quoting *People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 530 [206 Cal.Rptr. 164, 53 A.L.R.4th 661].) However, in *Cel-Tech,* our Supreme Court recently found that this formulation of unfairness is "too amorphous" and disapproved its use, at least with respect to claims of unfair competition between two direct competitors. (*Cel-Tech, supra,* 20 Cal.4th at pp. 184-185.) The *Cel-Tech* court required "that any finding of unfairness to competitors under section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." (*Id.* at pp. 186-187.)[14]

The Business and Professions Code section 17200 claim in this case, unlike that in *Cel-Tech,* does not pertain to unfair competition between direct competitors. Nonetheless, accepting the suggestion of *Cel-Tech* that *any* claims of unfairness under the UCL should be defined in connection with a legislatively declared policy, we find such a test satisfied in this case. As we earlier stated, Civil Code section 1936, subdivision (m)(2) is predicated on the premise that renters will not only be fully apprised of the avoidability of charges for optional services, but as well of the major factors imposed by a rental car company that bear upon the decision to avoid or incur such charges. Efforts by a rental car company to obscure such information offend that legislative premise. Accordingly, if, as *Cel-Tech* suggests, "unfairness" under the UCL must be "tethered to some legislatively declared policy"

---

[14]The *Cel-Tech* court adopted the following test: "When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Cel-Tech, supra,* 20 Cal.4th at p. 187.)

(*Cel-Tech, supra,* 20 Cal.4th at p. 186), there is such a connection with respect to appellant's contention in this case.[15]

Unlike "unlawfulness," "unfairness" is an equitable concept that cannot be mechanistically determined under the relatively rigid legal rules applicable to the sustaining or overruling of a demurrer. As then Presiding Justice Kaus explained, "the determination of whether a particular business practice is unfair necessarily involves an examination of its impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim—a weighing process quite similar to the one enjoined on us by the law of nuisance. [Citations.] While this process is complicated enough after a hearing in which the defendant has revealed the factors determining the utility of his conduct, it is really quite impossible if only the plaintiff has been heard from, as is the case when it is sought to decide the issue of unfairness [under the UCL] on demurrer. Therefore—since the complaint is unlikely to reveal defendant's justification—if that pleading states a prima facie case of harm, having its genesis in an apparently unfair business practice, the defendant should be made to present its side of the story. If, as will often be the case, the utility of the conduct clearly justifies the practice, no more than a simple motion for summary judgment would be called for." (*Motors, Inc. v. Times Mirror Co.* (1980) 102 Cal.App.3d 735, 740 [162 Cal.Rptr. 543], fn. omitted; *Saunders v. Superior Court* (1994) 27 Cal.App.4th 832, 839 [33 Cal.Rptr.2d 438]; cf. *People v. McKale, supra,* 25 Cal.3d 626, 635 [" 'What constitutes "unfair competition" or "unfair or fraudulent business practice" under any given set of circumstances is a question of fact.' "].)

The sustaining of the demurrer in this case cannot be upheld on the ground appellant failed to established that he or other Hertz customers were misled by the company to their detriment. ■ In order to state a cause of action under the fraud prong of the UCL a plaintiff need not show that he or others were actually deceived or confused by the conduct or business practice in question. "The 'fraud' prong of [the UCL] is unlike common law fraud or deception. A violation can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage. Instead, it is only necessary to show that members of the public are likely to be deceived." (*Podolsky v. First Healthcare Corp., supra,* 50 Cal.App.4th at pp. 647-648, citing *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 211 [197 Cal.Rptr. 783, 673 P.2d 660]; and

---

[15]We further note that at least one other court has found that *Cel-Tech*'s disapproval of the language in *Casa Blanca* and *State Farm* "was expressly limited to the competitor context and specifically stated not to relate to 'actions by consumers.' " (*South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861, 877, 887 [85 Cal.Rptr.2d 301].)

*State Farm Fire & Casualty v. Superior Court, supra,* 45 Cal.App.4th at p. 1105; *Day v. AT & T Corp.* (1998) 63 Cal.App.4th 325, 332-333 [74 Cal.Rptr.2d 55].)

This principle was applied in *People v. Dollar Rent-A-Car Systems, Inc., supra,* 211 Cal.App.3d 119, in connection with provisions of a rental agreement similar in some ways to the one before us. There, the trial court issued a civil judgment and permanent injunction against three rental car companies for, inter alia, unfair competition under the UCL. The agencies had sold a collision damage waiver (CDW) to numerous customers on the basis of several misrepresentations. Also, when making repairs to cars damaged during a rental, the agencies often charged customers a marked up price. The body shops that made the repairs charged the defendants a discounted "wholesale" price due to the high volume; the defendants were also able to purchase replacement parts at more than a 30 percent discount. (*Id.* at p. 125.) Instead of passing these savings along to their customers, the defendants "prepared new repair invoices to reflect a higher 'retail cost' rather than these actual costs for repair. They never informed the customers of this practice, nor did defendants supply customers with an itemized list of the inflated charges. This practice left customers with the erroneous impression that defendants are passing on only the actual repair charges." (*Ibid.*)

One of the form rental agreements Dollar utilized "did not contain any notice that the customers would be billed at the inflated retail rate even though this was defendants' practice at the time." (*People v. Dollar Rent-A-Car Systems, Inc., supra,* 211 Cal.App.3d at p. 129.) Accordingly, upholding the judgment of the trial court that the defendants' conduct constituted an unfair business practice under the UCL, the Court of Appeal found that "[t]he language in the subsequent contracts that customers were liable for the 'retail value' of all damages does not resolve the ambiguity. The absence of any notice that the customers are liable for damages or loss of use beyond their actual cost is misleading and constitutes an unfair business practice." (*Id.* at pp. 129-130.)

In reaching this conclusion, the court also noted that options available to customers were not described in detail in the rental agreement forms themselves. The face of the agreement contained three boxes containing the CDW options. The first stated "Collision Damage Waiver," the second "$250.00 Collision Liab.," and the third "$500.00 Collision Liab." Each box contained small print directing the renter to the back of the contract for the explanation of each option. "The back of the contract was almost completely covered with 20 paragraphs of very small print. A customer would have to be an extraordinarily fast reader with remarkable eyesight to read the entire contract during the average four-minute rental transaction." (*People v. Dollar Rent-A-Car Systems, Inc., supra,* 211 Cal.App.3d at p. 126.) As the Court of

Appeal observed, "[e]ven on the chance that a customer would have read the entire agreement, front and back, it is unreasonable to expect that person to understand he was liable for a sum considerably in excess of defendants' actual repair costs or rental charges. Defendants do not otherwise explain the practice. One can conclude that this language was reasonably likely to confuse and mislead." (*Id.* at p. 130.) The *Dollar* court also rejected the defendant companies' argument that "there was no misrepresentation regarding the cost of repairs since they billed the customers only what the contract permitted." (*Id.* at p. 129.) The court pointed out, first, that "[d]efendants' practice of charging its customers a higher 'retail repair rate' without explanation or substantiation is a deceptive business practice which falls within the protection of this statute." (*Ibid.*) Furthermore, the court stated, the contract "did not contain any notice that the customers would be billed at the inflated retail rate even though this was defendants' practice at the time." (*Ibid.*)

The failure of a rental car company to clearly specify in the rental agreement the amount of gasoline charges that might be imposed was also a factor in a ruling for the plaintiff in a New York case, *Super Glue Corp. v. Avis Rent A Car Sys.* (1990) 159 A.D.2d 68 [557 N.Y.S.2d 959]. The court in that case initially rejected, as we do, the plaintiff's claim that the manner in which the defendant rental car company computed its refueling charge was deceptive or misleading. "Given the optional character of the service and the disclosures contained on the rental agreement, we find that no coercion is placed upon the customer who chooses to return the vehicle with less gasoline than was present when it was rented and is therefore charged for gas. Merely because the premiums charged by Avis for its optional refueling service are substantial does not subject the premiums to review by the courts." (*Id.*, 557 N.Y.S.2d at p. 961.) However, the court reversed the grant of summary judgment for the rental car company on a cause of action alleging breach of contract based on language in the rental agreement characterizing the refueling charge as a "reimbursement," which the court found ambiguous and misleading. As the court explained, the "[t]he term 'reimburse' is susceptible to two interpretations: either the customer would pay for the actual cost to Avis of the gasoline utilized or would simply pay Avis for its gas without regard to actual cost. Therefore, the term is ambiguous [citation], unless, as in certain cases, the refueling charge was written on the face of the agreement. A question of fact exists as to how a reasonable customer would have interpreted the provision, thereby precluding summary judgment. [Citations.]" (*Ibid.*) ▆▆▆ Similarly, in the present case, a question of fact exists as to whether a reasonable Hertz customer would know from the rental agreement and rental record the amount of the

fuel service charge to which the customer might be exposed if he or she rejected the fuel purchase option.[16]

We are not called upon to finally decide and express no view as to whether the manner in which Hertz advises customers of its fuel service charge actually constitutes an unfair or fraudulent business practice under the UCL. Hertz may well be able to show a need to present information pertaining to the fuel service charge as it does and that renters are adequately informed of the charges to which they may be subject; but Hertz cannot make such showings in connection with a demurrer, which admits contrary allegations of the complaint. Since subdivision (m)(2) of Civil Code section 1936 does not provide Hertz a safe harbor against the allegations that it confuses and misleads customers in violation of the "unfair" and "fraud" prongs of the UCL, these allegations sufficiently state a claim under the UCL. Sustaining the demurrer improperly relieved Hertz of the need to explain and justify its conduct, or show that customers were not misled by that conduct to their detriment.[17]

## III. DISPOSITION

For the foregoing reasons, the judgment dismissing the complaint is reversed. Appellant is awarded his costs on appeal.

Haerle, J., and Ruvolo, J., concurred.

Respondent's petition for review by the Supreme Court was denied June 2, 2000. Baxter, J., was of the opinion that the petition should be granted.

[16]Indeed, neither does the rental agreement nor anything else in the record before us disclose how the fuel service charge is calculated for renters who *accept* the fuel service option and purchase fuel from Hertz at the outset of the rental. Such renters are presumably subject to a per gallon rate, but we do not know whether it differs from the per gallon rate of $3.19 imposed on renters who reject the fuel purchase option, then purchase fuel during the rental, but return the car with less than a full tank.

[17]This case is thus distinguishable from *Lewis v. Hertz Corp.* (1992) 181 A.D.2d 493 [581 N.Y.S.2d 305], which Hertz relies upon, even if, as Hertz asserts, New York has a law "virtually identical to Civil Code section 1936(m)(2)." The court in *Lewis* concluded that "[w]hile the consumer practices of the defendant Hertz Corporation may raise serious questions about its business methods, it has managed to stay within the strictures of the law." (*Id.*, 581 N.Y.S.2d at p. 307) The court pointed out, however, that "[t]he issue presented by the instant motion and cross-motion was not that of a motion to dismiss . . . for failure to state a cause of action, which merely addresses the sufficiency of pleadings, but a motion for summary judgment . . . , which searches the record and looks to the sufficiency of the underlying evidence. [Citation.]" (*Id.* at p. 308.) As we have said, the trial court and this court lack evidence of the sort relied upon in *Lewis*, as Hertz's demurrer does no more than challenge the sufficiency of the pleadings. Furthermore, the only issue in *Lewis* was the validity of the options Hertz presented its customers; the plaintiff in that case evidently did not additionally claim, as does appellant here, that the rental agreement was confusing and misleading and independently constituted an unfair business practice under an applicable statute.