[No. B225403. Second Dist., Div. Four. Dec. 5, 2011.]

MICHAEL LOPEZ et al., Plaintiffs and Appellants, v.
NISSAN NORTH AMERICA, INC., et al., Defendants and Respondents.

574

COUNSEL

Mower, Carreon & Desai, Aashish Y. Desai; The Arkin Law Firm and Sharon J. Arkin for Plaintiffs and Appellants.

Sedgwick, Jacqueline M. Jauregui, Douglas J. Collodel and Christina J. Imre for Defendants and Respondents.

OPINION

WILLHITE, J.—

## INTRODUCTION

To regulate the accuracy of commercial measuring instruments, California has adopted the tolerance standards set by the National Institute of Standards and Technology (NIST). Business and Professions Code section 12500, subdivision (c),[1] provides, in substance, that any commercial measuring instrument that is accurate within the relevant NIST tolerance standard is "correct."

---

[1] Subsequent undesignated references to code sections are to the Business and Professions Code.

The instant case, a class action brought by plaintiffs Michael Lopez, Gale Somadi, Nu Butthajit, Thomas Estrada, and Calvin Chambers against defendants Nissan North America, Inc. (NNA), and Nissan Motor Acceptance Corporation (collectively, Nissan), involves the accuracy of passenger vehicle odometers, one of the measuring instruments governed by the NIST standards.[2] The odometers at issue allegedly overregister mileage by approximately 2 percent. Although the alleged miscalibration is within the applicable 4 percent tolerance, plaintiffs contend that the odometers nonetheless are not "correct" under section 12500, subdivision (c).

We hold that passenger vehicle odometers are "correct" if they register actual mileage within the 4 percent tolerance and the designer or manufacturer does not deliberately miscalibrate them to underregister or overregister mileage. This standard is substantially the same as that applied by the trial court in granting summary judgment for Nissan.

We also hold that section 12500, subdivision (c), is a "safe harbor" provision (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 182 [83 Cal.Rptr.2d 548, 973 P.2d 527]) under which odometers are, as a matter of law, "correct" if they meet the relevant tolerance standard and were not deliberately miscalibrated. Because such deliberate miscalibration has not been shown here, the statute bars plaintiffs' claims under consumer protection statutes (§§ 17200, 17500; Civ. Code, § 1750 et seq.) based on the alleged inaccuracy of odometers that meet the NIST standard or based on the failure to disclose such alleged inaccuracy.

Applying these holdings, we affirm the grant of summary judgment.

## BACKGROUND

Plaintiffs' operative pleading is the first amended complaint (the complaint), which alleges causes of action for (1) breach of warranty; (2) breach of contract; (3) breach of covenant of good faith and fair dealing; (4) unlawful business practices (§ 17200 et seq.; UCL); (5) unfair and fraudulent business practices (UCL); (6) unfair or deceptive trade practices (Consumers Legal Remedies Act; Civ. Code, § 1750 et seq.; CLRA); (7) negligent and intentional misrepresentation; and (8) false advertising (§ 17500 et seq.; FAL).

The claims are premised on allegations that Nissan purposefully designed, calibrated, and altered the odometers on its vehicles to overregister the actual

---

[2] Plaintiffs' case was coordinated with a second class action against Nissan North America, Inc., but the plaintiffs in that second case are no longer a party to this appeal.

miles driven by at least 2 percent, that Nissan concealed the odometer overregistration from its customers with the intent to deceive them, and that the overregistration resulted in overpayment for vehicles, loss of resale value, premature expiration of warranties, improper repair costs, and excessive lease payments and end-of-lease charges.[3] The putative class contains all California residents who, in California, bought or leased a new model year 2004 through 2007 Nissan or Infiniti vehicle.

Nissan moved for summary judgment, arguing that none of the causes of action could stand, because California law considers an automobile odometer "correct" if it registers the actual mileage within a tolerance of plus or minus 4 percent (§ 12500, subd. (c)), and plaintiffs had no evidence to show Nissan deliberately designed its odometers to overregister mileage. The trial court granted summary judgment for Nissan, concluding that California's "safe harbor" provision—section 12500, subdivision (c)—does not protect manufacturers from liability for intentional miscalibration, but that plaintiffs failed to raise a triable issue as to whether Nissan had deliberately designed its odometers to overregister mileage.

Plaintiffs appeal from the judgment. They contend that the standard applied by the trial court is incorrect. According to plaintiffs, for Nissan's odometers to be deemed "correct," Nissan must have in good faith done everything that was technologically possible to center the odometers on zero. Plaintiffs also contend that, even assuming the trial court applied the correct standard, disputed issues of material fact exist such that granting summary judgment was inappropriate. Finally, although the thrust of their complaint is that Nissan deliberately miscalibrated its odometers to overregister mileage by approximately 2 percent, with the intent to deceive consumers, in their reply brief on appeal plaintiffs shift their theory, contending that even if Nissan's odometers are "correct" under the trial court's standard, Nissan can still be liable for failing to disclose to consumers that its odometers overregister mileage.

We affirm the trial court's judgment in all respects. We begin with the appropriate definition of "correct" odometers under section 12500, subdivision (c).

---

[3] Plaintiffs also allege that Nissan made false representations to consumers about the performance of its odometers, but the record includes no evidence of any representation by Nissan to consumers about its odometers.

■■■■■■■■■■■■■■■■■■■■■■■■

### DISCUSSION

I. *"Correct" Odometers Under California Law*

    A. *Tolerance for Inaccuracy in Odometer Readings*

An odometer consists of a system of interconnected components that measure and record the distance a vehicle travels. To measure mileage, the odometer system counts the number of wheel revolutions as the car travels. The number of wheel revolutions is multiplied by the circumference of the tires to yield a distance measurement.

Several factors can limit the precision of odometer systems. First, tires have inherent variations in their circumference in part due to manufacturing tolerances that permit tires of the same designated size and type to vary in their circumference. Differences in tire design, construction and the type of tread from the same or different manufacturers also impact actual tire size. Further, a tire's actual circumference may change over time and during operation of the vehicle: a new tire is larger in circumference than an older tire with worn tread; an underinflated tire is smaller in circumference than an overinflated tire; and vehicle speed, the load carried by the vehicle, outside temperature conditions, and road surface also all affect tire size.

Recognizing the limitations on odometer accuracy, the Society of Automotive Engineers (SAE), a nonprofit educational and scientific organization whose 90,000 engineers and scientists develop technical information on automobiles and other vehicles, recommends that variations of plus or minus a 4 percent inaccuracy should be permitted for odometers. Such an allowance for a particular measure of inaccuracy is called a "tolerance."

Likewise, NIST, the agency within the United States Department of Commerce directed by Congress to develop national standards of measurement (15 U.S.C. § 272(b)(2)), recommends a plus or minus 4 percent tolerance for odometers in its Handbook 44, Specifications, Tolerances, and Other Technical Requirements for Weighing and Measuring Devices (the NIST Handbook). (NIST Handbook (2008) § 5.53, A.1, T.1, T.2.)[4]

■ California law provides that the Director of California's Department of Food and Agriculture (the Department) "shall establish tolerances and specifications and other technical requirements for commercial weighing and measuring. In doing so, the director shall adopt, by reference, the latest

---

[4] According to the foreword to the NIST Handbook, NIST republishes the handbook "in its entirety each year following the Annual Meeting of the National Conference on Weights and Measures." (NIST Handbook, *supra*, Foreword.)

standards as recommended by the [NIST Handbook] except as specifically modified, amended, or rejected by regulation adopted by the director." (§ 12107; see §§ 12002, 12003.) The devices subject to such regulation include odometers. (§ 12500, subd. (e).) Accordingly, California has adopted the NIST Handbook's recommended tolerance of plus or minus 4 percent for odometers in passenger vehicles.[5] Under section 12500, subdivision (c), any odometer that registers within this tolerance, like any other measuring instrument that meets the NIST standard for that instrument, is "correct."[6]

## B. *Interpreting Section 12500, Subdivision (c)*

In moving for summary judgment, Nissan asserted that plaintiffs had tacitly asked the trial court to create an exception to section 12500, subdivision (c), such that odometers that comply with the 4 percent tolerance nevertheless would *not* be considered "correct" if they were knowingly designed or calibrated to inflate the distance traveled. Assuming for the sake of argument that deliberately miscalibrated odometers are not "correct" under section 12500, subdivision (c), Nissan premised its summary judgment motion on the argument that plaintiffs had no evidence of any such intentional miscalibration, and to the contrary, the evidence demonstrated that Nissan centered its odometers on zero where feasible. In opposing summary judgment, plaintiffs argued, in part, that Nissan's odometers were not "correct" because Nissan intentionally set its odometer systems to overregister mileage.

Before deciding the summary judgment motion, the trial court issued a notice to the California Attorney General and the Department requesting the Department's position on "whether the tolerances set by California law and by the Director of the Department of Food and Agriculture create a 'safe harbor' such that commercial activity is permitted so long as measuring devices comply with the established tolerances; or rather whether businesses that comply with the tolerances nevertheless may be sanctioned for intentionally manipulating equipment to the advantage of the business and the disadvantage of the customer." In an amicus curiae brief on behalf of the

---

[5] Although the NIST Handbook states that its standard "applies to odometers that are used or are to be used to determine the charges for rent or hire of passenger vehicles," (NIST Handbook, *supra*, § 5.53, A.1) and section 12107 directs the Department to adopt the NIST Handbook's tolerances for "commercial" measuring devices, both parties concede that the 4 percent tolerance is applicable to odometers in vehicles sold to consumers in California. In the proceedings below the Department interpreted the 4 percent tolerance to apply to passenger vehicles sold or leased to customers in California. The trial court deferred to the Department's reasonable position, and so do we.

[6] Section 12500, subdivision (c) states in full: "As used in this chapter the following terms mean: [¶] . . . [¶] (c) 'Correct' means any weight or measure or weighing, measuring, or counting instrument which meet all of the tolerance and specification requirements established by the director pursuant to Section 12107." (§ 12500, subd. (c).)

Department, the Attorney General stated that no 4 percent "safe harbor" exists where deliberate miscalibration of an odometer is involved. Rather, the Department's position was that even if an odometer overstates mileage by less than 4 percent, *deliberately* miscalibrating an odometer constitutes a violation of California's consumer protection laws and odometer tolerance regulations. The trial court agreed, holding that "the tolerance regulations do not provide a safe harbor for deliberate miscalibration of an odometer. Devices shall not facilitate the perpetration of fraud."

Having conducted a de novo review of the question of the proper inter-pretation of section 12500, subdivision (c) (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332 [104 Cal.Rptr.3d 219, 223 P.3d 77]), we agree with the Department and the trial court that it would be unfair to construe section 12500, subdivision (c) to permit manufacturers to deliberately design odom-eters that overregister mileage close to, but not above, the tolerance. As the NIST Handbook states, "[e]quipment owners should not take advantage of tolerances by deliberately adjusting their equipment to have a value, or to give performance, at or close to the tolerance limit." (NIST Handbook, *supra*, Fundamental Considerations Associated with the Enforcement of Handbook 44 Codes, appen. A, § 2.3.) Section 12500, subdivision (c) must be construed in a manner consistent with the NIST standard that California law has adopted. Thus, like the NIST standard, section 12500 does not protect deliberate manipulation by the designer or manufacturer to overregister or underregister mileage.

Plaintiffs further contend that an odometer should be considered "correct" under section 12500, subdivision (c) *only* if a manufacturer has made "every effort to center the odometer on zero," using every "technologically possible" means. They contend that the NIST Handbook supports their interpretation. We disagree.

The NIST Handbook emphasizes that "[u]niformity of specifications and tolerances is an important factor in the manufacture of commercial equipment. Deviations from standard designs to meet the special demands of individual weights and measures jurisdictions are expensive, and any increase in costs of manufacture is, of course, passed on to the purchaser of equipment. On the other hand, if designs can be standardized by the manufacturer to conform to a single set of technical requirements, production costs can be kept down, to the ultimate advantage of the general public." (NIST Handbook, *supra*, appen. A, § 1.1.) If we were to adopt plaintiffs' suggested standard and hold that designers and manufacturers are bound to create and manufacture odometers that not only comply with the 4 percent tolerance, but also utilize the most accurate technology possible, we would be imposing on them the very sort of "special demand[]" that NIST cautions would result in increased costs

inevitably passed on to the consumer. (*Ibid.*) While the NIST-recommended 4 percent tolerance would continue to apply in other jurisdictions, manufacturers would have to meet a different, stricter standard in California. The resulting inconsistency in the standards would undermine the very purpose of a nationwide standard tolerance.

Further, the particular tolerance of plus or minus 4 percent for odometers represents NIST's determination of the best compromise between consumer protection (precise measurement) and business reality (the need for uniformity and for consideration of cost and other business-related constraints). The NIST Handbook explains that "errorless value or performance of mechanical equipment is unattainable. Tolerances are established, therefore, to fix the range of inaccuracy within which equipment will be officially approved for commercial use." (NIST Handbook, *supra*, appen. A, § 2.1.) "Tolerance values are so fixed that the permissible errors are sufficiently small that there is no serious injury to either the buyer or the seller of commodities, yet not so small as to make manufacturing or maintenance costs of equipment disproportionately high. Obviously, the manufacturer must know what tolerances his equipment is required to meet, so that he can manufacture economically. His equipment must be good enough to satisfy commercial needs, but should not be subject to such stringent tolerance values as to make it unreasonably costly, complicated, or delicate." (NIST Handbook, *supra*, appen. A, § 2.2.) In assigning a plus or minus 4 percent as the tolerance for odometers, NIST has already struck what it believes to be the necessary practical balance between precision and cost. NIST publishes an updated handbook every year, and presumably can and will narrow the tolerance range in the event that technological advances are made such that greater precision is possible without significantly raising the design and manufacture costs.

As support for their contention that manufacturers and designers must design to a more stringent standard than the plus or minus 4 percent tolerance, plaintiffs rely on the interpretation of the NIST standard urged by the Department in the trial court, as well as several portions of the NIST Handbook cited by the Department. Of course, we are not bound by the Department's interpretation. "An agency interpretation of the meaning and legal effect of a statute is entitled to consideration and respect by the courts; however . . . , the binding power of an agency's *interpretation* of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) "Courts must, in short, independently judge the text of the statute, taking into account and respecting the agency's interpretation of its meaning, of course, whether embodied in a formal rule or less formal representation. Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools

available to the court. Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth. [Citation.] Considered alone and apart from the context and circumstances that produce them, agency interpretations are not binding or necessarily even authoritative." (*Id.* at pp. 7–8.)

Here, the Department's amicus curiae brief filed in the trial court, relying on certain statements in the NIST Handbook, states that "[t]he regulations require manufacturers to set odometers as closely to zero as possible."[7] It is far from obvious that the Department agrees with plaintiffs' suggestion that manufacturers must use *every technologically possible* means of achieving zero error. However, to the extent the Department suggests that the NIST Handbook supports a more stringent standard than one requiring designers and manufacturers to meet the 4 percent tolerance and refrain from deliberately miscalibrating their odometers, we do not agree with the Department's interpretation.

■ At the summary judgment hearing, the Department cited sections of the NIST Handbook relating to the Necessity for Inspection and Maintenance Requirements.[8] Neither of these sections pertains to the effort required of manufacturers or designers in calibrating equipment accurately at the time of manufacture. In addition, the Department cited the NIST Handbook provision that states, "Nor should *the repair or service personnel* bring equipment merely within tolerance range when it is possible to adjust closer to zero error." (NIST Handbook, *supra*, appen. A, § 2.3, italics added.) However, this statement plainly applies to repair and service personnel, not to manufacturers or designers. The same paragraph does state that when equipment *initially* is being adjusted for accuracy, as it is by the manufacturer or designer, "the objective should be to adjust as closely as practicable to zero error." (*Ibid.*) The word "practicable" "does not necessarily mean the most

---

[7] Further, at the hearing on Nissan's summary judgment motion, the trial court asked the deputy attorney general who appeared on behalf of the Department to articulate the burden on manufacturers. The deputy attorney general responded that "the law says that the manufacturer is supposed to make every effort to center the odometer on zero."

[8] The Department cites the following provision in the appendix to the Handbook: "Necessity for Inspection.—It is not enough merely to determine that the errors of equipment do not exceed the appropriate tolerances. Specifications and user requirements are as important as tolerance requirements and should be enforced." (NIST Handbook, *supra*, appen. A, § 4.2, boldface omitted.) In addition, the Department relies on a section of the appendix entitled "Maintenance Requirements" which states in part, "Maintenance of Equipment.—All equipment in service and all mechanisms and devices attached thereto or used in connection therewith shall be continuously maintained in proper operating condition throughout the period of such service. Equipment in service at a single place of business found to be in error predominantly in a direction favorable to the device user shall not be considered 'maintained in a proper operating condition.'" (NIST Handbook, *supra*, General Code, § 1.10, G-UR.4, p. 1-8, boldface omitted.)

that can possibly be done" (*Building Industry Assn. of San Diego County v. State Water Resources Control Bd.* (2004) 124 Cal.App.4th 866, 889 [22 Cal.Rptr.3d 128]), but rather is synonymous with "feasible" and allows for reasonable limitations, including economic, practical, and technical limits. (Black's Law Dict. (9th ed. 2009) p. 1291 [defining "practicable" as "reasonably capable of being accomplished; feasible"]; *County of Los Angeles v. Fairmont Specialty Group* (2009) 173 Cal.App.4th 538, 545, fn. 3 [92 Cal.Rptr.3d 767] [upholding trial court's determination that it was not "feasible" to obtain extradition of defendant, even if it might be "possible," and drawing distinction between meaning of "possible" and "practicable"].) The suggestion by NIST that manufacturers should strive to adjust odometers "as closely as practicable to zero error" must be read in the context of the overall rationale of the NIST Handbook—that the individual tolerances adopted by NIST for various measuring and weighing devices represent the proper balance between precision and cost, or in other words, they define the practicable range of inaccuracy for those devices. We do not believe that the provisions relied upon by the Department support the imposition of more stringent standards with respect to odometer design and manufacture.

██ In sum, we conclude that the standard plaintiffs advocate—which would require manufacturers to do *everything technologically possible* to produce odometers that do not overregister or underregister mileage—would be patently inconsistent with the rationales underlying the tolerance for odometers described in the NIST Handbook and would effectively eviscerate the tolerance adopted for odometers. We interpret section 12500, subdivision (c), consistently with the fundamental balance struck by the NIST standard. Odometers that meet the 4 percent tolerance recommended by NIST are legally "correct" under section 12500, subdivision (c), so long as the designer or manufacturer does not deliberately miscalibrate them to underregister or overregister mileage.

We now turn to whether plaintiffs were able to show a factual dispute as to whether Nissan's odometers meet this standard for "correct" odometers.

II. *Plaintiffs Failed to Proffer Evidence Showing That Nissan Intentionally Set Its Odometers to Overregister*

Summary judgment is appropriate only where no material issue of fact exists or where the record establishes as a matter of law that none of the causes of action has merit. After examining the facts before the trial judge on a summary judgment motion, an appellate court independently determines their effect as a matter of law. (*Nicholson v. Lucas* (1994) 21 Cal.App.4th 1657, 1664 [26 Cal.Rptr.2d 778].)

As discussed below, Nissan's evidence established that Nissan did not deliberately miscalibrate its odometers to overregister, and to the contrary, attempted to center its odometers on zero. The evidence proffered by plaintiffs failed to create a triable issue of fact on this point.

A.  *Nissan's Evidence*

In moving for summary judgment, Nissan relied on a declaration from John Schnoes, the engineering director of the Electrical and Electronics Department of Nissan Technical Center North America, Inc. (NTCNA), a subsidiary of NNA. NTCNA performs research, development, design and testing for Nissan and Infiniti vehicles manufactured in the United States. Schnoes is familiar with the design of the odometer systems in Nissan and Infiniti vehicles, as he has direct responsibility for the design and testing of some of the components and coordinates with the design groups responsible for other components of the odometer system.

Schnoes states that "Nissan odometer system tolerances are centered on zero where possible, recognizing that there will be a variation both above and below the center point and certain design constraints may prevent the engineers from centering exactly on 0.0%." He states that Nissan has not designed the odometer systems to bias or inflate mileage; to the contrary, "[t]here is a purposeful effort to design odometer systems for each vehicle model that are centered around 0.0% where possible and, where not possible due to design constraints, to minimize the variation from 0.0%." Nissan has a target for odometer accuracy of minus 3.75 percent to plus 3.75 percent, applicable to all its odometer systems on vehicles sold in the United States.

For vehicles manufactured during the 2004–2007 model year timeframe, Nissan and Infiniti vehicles used two general odometer designs: (1) a speed sensor type and (2) an ABS (antilock braking system) type. Schnoes explains the constraints on odometer accuracy associated with each type of odometer design.

In the speed sensor type of odometer system, as with all odometer systems, tire size must be factored in. Engineers estimate the tire size by obtaining data about each tire to be used on the particular type of vehicle, including different brands, types and sizes of tires. Generally, for each different brand, type and size of tire, the tire manufacturer provides data about how the actual size is expected to vary assuming certain vehicle loading and tire inflation conditions. The data is submitted as a range of expected actual sizes because of the anticipated manufacturing variabilities for each tire.

In addition to data input regarding the tire radius, the odometer system relies on input regarding the number of revolutions of the output drive shaft

on the transmission. A pinion gear is inserted between the output shaft and a speed sensor, which converts the rotation of the pinion gear into electrical pulses that are sent to the instrument cluster. The instrument cluster records mileage based on the number of electrical impulses that it receives. In order to get the speed sensor to send pulses that match actual distance traveled as closely as practical for the full range of vehicle speeds, the engineers must determine how many teeth are needed on the pinion gear. The exact ratio needed for the gears frequently would result in a fractional number of teeth, but a gear cannot include a fractional number of teeth. Thus, engineers must make a decision about whether to round up or round down to the nearest number of teeth. This limitation is referred to as "take off pinion design limits."

Depending on whether the number of teeth is rounded up or down, there could be a slight underregistration or slight overregistration of the mileage. Schnoes states that "[i]n making this rounding decision, Nissan engineers attempt to select the gear with the number of teeth that will result in the most accurate measurement of vehicle speed and distance across the full range of vehicle speeds and also comply with the Nissan internal target of ± 3.75% across the full range of vehicle speeds. Often, only one pinion gear will meet these criteria. In those circumstances where more than one gear will meet the criteria, the gear that would yield the least variation from 0.0% is to be selected."

According to Schnoes, "[w]hile these design limits, as well as all of the other factors mentioned, may lead to some slight under-registration or over-registration depending on the particular vehicle, tires and circumstances of use, we expect and design Nissan and Infiniti vehicles for this slight under-registration or over-registration to be less than the Nissan internal design target of ± 3.75%."

For the second type of Nissan odometer system, an ABS type of odometer system, Nissan uses wheel speed information collected by the antilock braking systems instead of the transmission output shaft. "This information is transmitted to the vehicle's ABS controller which averages the revolution speed of the wheels and then calculates the vehicle speed. In order to make this vehicle speed calculation, the ABS controller must have the tire size for the vehicle model in addition to the speed at which the wheels are turning." The estimated tire size for the vehicle is programmed into the control module. The vehicle speed calculated by the control module is then broadcast to the meter or instrument cluster, which reads the vehicle speed messages more than 50 times a second. Knowing vehicle speed at these time intervals permits the processor in the instrument cluster to calculate the distance traveled.

Most models of vehicles using an ABS type odometer system are available with more than one size of tire and more than one size of rim, and thus engineers pick an average tire size to be programmed into the control module. As with the speed sensor type of odometer, engineers obtain data on how each brand, type, and size of tire is expected to vary under dynamic conditions. Based on this data, Nissan engineers evaluate the smallest as well as the largest dynamic tire size expected among all of the tires available for that model, and then "select a tire radius that is an appropriate midpoint between these two values" to be used as the tire size number to program into the system for use in calculating vehicle speed as well as distance traveled.

"As a result of this design approach, some slight under-registration and over-registration are expected depending on the brand, model and size of the tire used (as well as all of the other circumstances that can affect odometer system variation). However, Nissan engineers verify that the size programmed into the vehicle electronics for the particular vehicle model will keep this slight over-registration and under-registration within the Nissan internal design target of ± 3.75%."

B.  *Plaintiffs' Evidence*

1.  *Excerpts from the Schnoes Deposition*

In opposing the summary judgment motion, plaintiffs cited to various excerpts from the deposition of Schnoes as supposed evidence that Nissan does not attempt to center its odometers "as close as possible to zero." Because, as we have concluded above, Nissan is not required to design or manufacture odometers that are centered as closely as possible to zero, plaintiffs would not defeat summary judgment by proffering evidence that Nissan could have produced more accurate odometers. Rather, plaintiffs only survive summary judgment by producing evidence suggesting that Nissan intentionally manipulated its odometers so that they would overregister. None of the testimony relied upon by plaintiffs suggests that Nissan engaged in such conduct.

For instance, Schnoes's testimony to the effect that Nissan applies a different internal tolerance of minus 1 to plus 6 in Japan is not relevant to the question whether Nissan intentionally set odometers on its North American vehicles to overregister. Similarly, Schnoes's admission that Nissan's plus or minus 3.75 percent tolerance is an internal design guideline created by Nissan and could be altered based on technical and market considerations does not suggest an intention on Nissan's part to set its odometers to overstate mileage.

While plaintiffs contend that Schnoes admitted in his deposition that Nissan centers its odometers at 1.115 percent rather than zero, an examination

of the testimony they cite reveals that Schnoes was merely describing the effect of the "take off pinion design limits" for Nissan's speed sensor type of odometer. Schnoes's testimony provides a helpful illustration of how technical and design constraints such as the "take off pinion design limits" can affect the precision of an odometer system. In the testimony to which plaintiffs point, Schnoes explains that, for the particular type of vehicle in question, Nissan engineers had to choose between two possible sets of pinion teeth in designing the sensor speed odometer system. The first option resulted in odometer accuracy ranging from minus 0.82 percent to plus 2.45 percent, with a midpoint of 1.115 percent, while the second option resulted in odometer accuracy ranging from minus 3.74 percent to minus 0.56 percent, with a midpoint of minus 1.59 percent. Neither option yielded 100 percent accuracy. Evidence that Nissan chose the option that led to an overregistering of 1.115 percent rather than an underregistering of minus 1.59 percent does not suggest that Nissan intended to set its odometers to overstate mileage; rather, it aptly shows the effect of the very design limitations that Schnoes acknowledges in his declaration.

Plaintiffs also point to Schnoes's admission that Nissan does not design its ABS type odometer systems to a zero error midpoint based on a particular tire used on a particular model, but rather looks at the minimum tire size and the maximum tire size and then sets the midpoint at the average of those tire sizes for that "family of tires." Schnoes admitted other manufacturers' odometer designs may incorporate a more particularized approach instead of averaging the tire size data as Nissan does. However, Schnoes testified that Nissan chose to employ an averaging approach for the family of tires in order "to reduce software complexity, part number complexity, and give a higher level of quality for our customer from that standpoint." Plaintiffs have presented no evidence to suggest that Schnoes's explanation was false and that Nissan's averaging approach is instead a deliberate attempt to manipulate the odometers so that they overstate mileage.

### 2. Leshner Declaration

Plaintiffs contend that the declaration from their expert witness, forensic engineer and SAE member Michael Leshner, creates a triable issue of fact. We disagree.

Leshner asserts in his declaration that Nissan violated an industry standard by incorporating in its odometer design tire radius data at high speeds up to 120 miles per hour. Specifically, he relies on SAE J862, an SAE guideline entitled "Factors Affecting Accuracy of Mechanically Driven Automotive Speedometer-Odometers." According to Leshner, SAE J862 specifies that odometer manufacturers should only incorporate tire radius at 20, 40, and 55

miles per hour in designing odometer systems. He alleges that incorporating the tire radius data at higher speeds artificially inflated the average tire radius used in Nissan's design. He further states that "[b]y basing its design calculations on an artificially high tire radius, Nissan programs exaggerated tire size data into vehicle odometer systems, effectively adjusting the calibration of its odometer systems to over-register. If the correct tire size data were programmed, vehicle odometer systems would register more accurately."

However, during his deposition, Leshner admitted that SAE J862 does *not* state that a manufacturer may only design its odometer systems using tire radiuses at 20, 40, and 55 miles per hour. He agreed that paragraph 4.1.2 of SAE J862—the particular provision he relies upon—concerns the "take off pinion design limits" of speed sensor odometers caused by the fact that in choosing a gear, engineers must frequently round up or round down to the nearest number of teeth on the pinion gear. Leshner acknowledges that SAE J862 merely provides that the selection of a particular pinion gear "must be accurate enough to assure that the odometer records actual distances traveled within ±4% at 20, 40, and 55 mph," *not* that manufacturers should only consider tire radius at these three speeds in calibrating odometers.

Further, Leshner admitted at his deposition that another industry standard—SAE J1226—provides that "overall odometer accuracy shall be within -4% to +4% for each actual unit of distance of travel *over the operating range of the instrument*," and that the "operating range" is any speed over five miles per hour. This SAE standard suggests that manufacturers must ensure that their odometers perform within the tolerance at high speeds as well as low speeds. Therefore, Leshner's conclusion that Nissan's odometer design violated industry standards by incorporating tire radius at high speeds lacks foundation and does not create a triable issue of fact.

Leshner also levels criticisms at the manner in which Nissan tests its odometer systems, complaining that Nissan uses simulations rather than road tests under representative conditions. However, the tests Leshner criticizes were designed to determine whether the odometers performed within Nissan's internal tolerance of plus or minus 3.75 percent, even under extreme conditions. Testing engineers were not responsible for calibrating the odometer systems, and their tests of the odometers did not concern whether Nissan's odometers were centered on zero. Thus, we agree with the trial court that "Leshner's criticism of testing protocols does not create an inference of an intent to center the odometer so that it overregisters." We note that the NIST Handbook specifically provides that a simulated road test is an appropriate means of determining an odometer's compliance with the tolerance. (NIST Handbook, *supra*, § 5.53, N.1.1(c).)

Leshner's declaration also includes a few general statements to the effect that Nissan's odometer systems are not centered on zero, statements which the trial court deemed inadmissible based on a lack of foundation. First, he states, "I disagree with the basic premise of the Schnoes Declaration that the design process as set forth in the [Nissan Engineering Manual], and presumably utilized by Nissan, results in odometer system tolerances centered on zero 'where possible.'" Second, Leshner declares that "Nissan's internal processes for odometer system design and validation incorporate several flawed elements that each contribute to bias the odometer system calibration toward over-registration." However, other than the testimony discussed above with respect to Nissan's practices of incorporating tire radius data from high speed situations and using an averaging approach for a family of tires (testimony which we have concluded fails to create an issue of fact with respect to Nissan's intentions), Leshner's declaration contains no other statements purporting to demonstrate that Nissan deliberately miscalibrates its odometers. Thus, we agree with the trial court that Leshner's conclusory statements about Nissan's intentions are inadmissible because they lack foundation.

Leshner also opines that Nissan's internal standard of plus or minus 3.75 percent for odometer error "could be modified by Nissan to further increase odometer system accuracy." However, the bare allegation that Nissan could produce a more accurate odometer system does not raise a material issue of disputed fact. As the trial court found, "[n]othing in state law or the NIST Handbook requires [Nissan] to adopt Mr. Leshner's view of the best available technology."

### 3. *Bredernitz Testimony*

Plaintiffs also rely on deposition testimony from Roger Bredernitz, a test engineer for NNA whose responsibilities include testing odometer system function. Bredernitz testified that if his testing of an odometer system on a particular automobile revealed that the odometer overregistered the mileage by 3 percent, he would simply note that the odometer performed within the permissible tolerance range of plus or minus 3.75 percent and would not suggest to Nissan's odometer design engineers that the odometer design be tweaked to make it more accurate. Further, plaintiffs note Bredernitz's testimony that he was not aware of anyone else at his particular facility who would adjust the input data that had been provided to make the test result come out more accurately. Plaintiffs suggest that it may be inferred from Bredernitz's testimony that no one at Nissan makes any effort to bring the odometer calibration closer to zero.

Bredernitz's testimony does not constitute evidence that Nissan intentionally designed its odometers so that they would overregister. In fact, plaintiffs'

argument improperly conflates two separate functions: (1) designing the odometer system to attempt to center the odometers on zero and (2) testing the odometers to ensure they comply with Nissan's plus or minus 3.75 percent internal tolerance. As a testing engineer, Bredernitz's role was limited to the second function. He was not involved with the design of the odometer systems. His failure to attempt to influence the design of the odometers based on the testing he performed to ensure tolerance compliance does not rationally lead to the conclusion that Nissan intentionally sets its odometers to overstate mileage.

### 4. *Henderson Testimony*

Plaintiffs also point to deposition testimony by Christopher Henderson, a design engineer, alleging that he admitted that Nissan's speed sensor type of odometer is centered on a "best fit" rather than on zero. However, in the testimony they rely upon, Henderson was merely explaining that technical constraints associated with the speed sensor type of odometer—namely the fact that the speed sensor pinion gear has a certain number of physical teeth on it—prevent Nissan from centering that system on zero and require engineers to center on a "best fit." His testimony is consistent with that of Schnoes and does not suggest an intention to miscalibrate the odometers.

In sum, plaintiffs fail to raise evidence disputing that Nissan's odometers comply with the plus or minus 4 percent tolerance and were not intentionally manipulated to overregister mileage, and thus are "correct" under section 12500, subdivision (c). We now consider whether the determination that Nissan's odometers are legally "correct" defeats each of plaintiffs' causes of action.

### III. *Summary Judgment on Plaintiffs' Causes of Action Was Properly Granted*

#### A. *UCL*

Plaintiffs argue that the trial court erroneously dismissed their causes of action for fraudulent and unfair business practices under section 17200.[9] Nissan counters that the UCL claims cannot survive the determination that plaintiffs failed to raise a material issue of disputed fact as to whether the Nissan odometers are "correct" under section 12500, subdivision (c).

In their opening brief, plaintiffs appear to acknowledge that Nissan's liability under the UCL turns on whether its odometers are legally "correct"

---

[9] Plaintiffs apparently have abandoned their UCL claim based on "unlawful" practices, as their appellate briefs make no reference to this claim.

under California law. However, in their reply brief, plaintiffs have adopted a new theory that, if credited, would permit Nissan to be found liable even if the odometers are "correct." They argue that even if Nissan's odometers are legally "correct," Nissan is liable under the UCL because Nissan failed to disclose the odometers' tendency towards overregistration and misled customers into believing that its odometers accurately recorded mileage. We reject their argument and conclude that the trial court correctly granted summary judgment on the UCL claims.

■ In this case, the applicability of the UCL's prohibition against fraudulent and unfair practices is governed by our Supreme Court's decision in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra*, 20 Cal.4th 163 (*Cel-Tech*). In *Cel-Tech*, the court held that "[a]lthough the unfair competition law's scope is sweeping, it is not unlimited. Courts may not simply impose their own notions of the day as to what is fair or unfair. Specific legislation may limit the judiciary's power to declare conduct unfair. If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." (*Cel-Tech, supra*, 20 Cal.4th at p. 182.) "To forestall an action under the unfair competition law, another provision must actually 'bar' the action or clearly permit the conduct." (*Id.* at p. 183.)

Recently, in *Alvarez v. Chevron Corp.* (9th Cir. 2011) 656 F.3d 925 (*Alvarez*), the Ninth Circuit applied the "safe harbor" doctrine of *Cel-Tech* in affirming the dismissal of the plaintiffs' UCL claim against gasoline companies. The complaint alleged that buyers of premium grade fuel routinely are overcharged at the pump when the previous purchaser selected a lower grade fuel, because due to the design of the gasoline dispensers, the subsequent buyer receives some residual lower grade fuel from the previous transaction. (656 F.3d at p. 928.)

However, the court found that because the dispenser design at issue complies with specific California regulations, including standards set forth in the NIST Handbook that were adopted by the Department, the design is deemed "correct" under California law. (*Alvarez, supra*, 656 F.3d at pp. 929, 933, citing §§ 12505, 12500, subd. (c).) As such, the gasoline company defendants may not be held liable for alleged unfair business practices resulting from the dispenser design. (656 F.3d at p. 933.) The court held that the "[d]efendants' conduct is clearly permitted by California law, and [d]efendants therefore are entitled to safe harbor from liability . . ." under the UCL. (656 F.3d at p. 931.) The court noted that "[t]here may well be a better dispenser design, and California regulators may consider implementing that

design in the future to remedy the residual fuel situation. However, under the current statutes and regulations, [d]efendants' conduct does not support a claim for which we may grant relief." (*Id.* at p. 935.)

■ Similarly, we conclude that section 12500, subdivision (c) provides a safe harbor against UCL claims complaining about the accuracy of odometers that qualify as "correct" under that provision. (§ 12500, subd. (c); see *Cel-Tech, supra,* 20 Cal.4th at p. 183.) California law specifically permits a slight measure of inaccuracy in odometers because it is uniformly understood that "errorless value or performance of mechanical equipment [(including odometers)] is unattainable." (NIST Handbook, *supra,* appen. A, § 2.1.) Just as "[n]o law generally requires a manufacturer to use the most expensive or most durable materials in the manufacture of its products" (*Bardin v. DaimlerChrysler Corp.* (2006) 136 Cal.App.4th 1255, 1273 [39 Cal.Rptr.3d 634]), neither the UCL nor any other law requires Nissan to employ the most accurate possible odometer design. (See *Alvarez, supra,* 656 F.3d at p. 935.) With respect to an odometer that qualifies as "correct" even though it may not be 100 percent accurate, the Legislature has implicitly determined that any slight injury to consumers does not outweigh the harm if more stringent requirements for precision were to apply. In deeming qualifying odometers "correct," section 12500, subdivision (c) "clearly permit[s]" their design (*Cel-Tech, supra,* 20 Cal.4th at p. 183), and we "may not use the unfair competition law to condemn actions the Legislature permits." (*Id.* at p. 184.)[10]

■ We also reject plaintiffs' argument that, even if its odometers are deemed "correct" under California law, Nissan is liable under the UCL for failing to disclose to consumers that its vehicles overregistered mileage by some amount below the 4 percent tolerance. We hold that so long as Nissan's odometers are "correct" under the law, it has no obligation to disclose that its odometers may not be 100 percent accurate.

---

[10] Plaintiffs contend that Nissan forfeited the "safe harbor" defense by failing to cite *Cel-Tech* or otherwise reference the safe harbor theory in its appellate brief. However, Nissan specifically invoked *Cel-Tech*'s safe "harbor" doctrine in moving for summary judgment below, and on appeal it argues, albeit more generally, that none of plaintiffs' claims can survive the determination that the odometers are legally correct. Because it is within our discretion to decide the issues before us based on the principles that we deem controlling, and because plaintiffs have addressed the "safe harbor" theory in detail in their reply brief, we decline to find that Nissan forfeited the argument. (See *Bourgi v. West Covina Motors, Inc.* (2008) 166 Cal.App.4th 1649, 1663 [83 Cal.Rptr.3d 758] (*Bourgi*) [" ' "[t]he rule requiring an adequate legal argument . . . is largely for the convenience of the reviewing court. And, since the court may decide a case on any proper points or theories, whether urged by counsel or not, there is no reason why it cannot examine the record, do its own research on the law, or accept a belated presentation." [Citation.]' [Citations.]"].)

While plaintiffs also allege that Nissan made affirmative misrepresentations about the accuracy of its odometers, in opposing summary judgment they submitted no evidence of any representations by Nissan to consumers with respect to the performance of its odometers (see fn. 3, *ante*), and instead rely only on vague allegations in their complaint that a Nissan manual states that "the odometer records the total distance the vehicle has been driven" and that lease agreements and warranties state that customers will only be charged for miles driven. "The plaintiff may not rely on the mere allegations or denials of the pleadings to show a triable issue of material fact exists." (*Redante v. Yockelson* (2003) 112 Cal.App.4th 1351, 1355 [6 Cal.Rptr.3d 10]; see Code Civ. Proc., § 437c, subd. (*o*)(2).) Even if we considered plaintiffs' allegations in the complaint sufficient, we would not find any fault with the alleged statements, because Nissan's odometers record distance traveled within the tolerance adopted for California and are legally "correct."

Contrary to plaintiffs' contentions, *Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144 [93 Cal.Rptr.2d 439] (*Schnall*), does not support their position that Nissan is obligated to disclose to consumers that its "correct" odometers may overregister mileage. In *Schnall*, the plaintiffs sued the Hertz rental car company over fuel service charges that it charged some of its customers who did not return their rented vehicles with a full tank of fuel. The court found that Civil Code section 1936, subdivision (m)(2) specifically permits rental companies to impose additional charges for optional services, including refueling charges, if the renter knows the charge is avoidable. (78 Cal.App.4th at p. 1155.) The court thus found that the statute provided a "safe harbor" against the UCL claim that the charge was unfair. (78 Cal.App.4th at pp. 1154–1156, 1162.)

On the other hand, the court found that this statute did *not* provide a safe harbor against the plaintiffs' claim under the UCL that Hertz unfairly and fraudulently misled consumers in the manner in which it disclosed the fuel service charges to consumers. (*Schnall, supra*, 78 Cal.App.4th at pp. 1163, 1170.) The court concluded that "[a]uthorization of avoidable charges for optional services hardly amounts to permission to mislead customers about such charges." (*Id.* at p. 1163.) The safe harbor provided by Civil Code section 1936, subdivision (m)(2) "is predicated on the premise that renters will not only be fully apprised of the avoidability of charges for optional services, but as well of the major factors imposed by a rental car company that bear upon the decision to avoid or incur such charges," such as the amount. (78 Cal.App.4th at p. 1166.) But Hertz's rental agreements did not even disclose the amount of the fuel service charges, instead referring to a separate document that the court found almost impossible to decipher. (*Id.* at pp. 1164–1166.) The court noted that "deception calculated to induce customers to subject themselves to an avoidable charge is inimical to the very concept of avoidability." (*Id.* at p. 1164.)

Having determined that the avoidability of the refueling charges was the basis for the safe harbor against claims challenging those charges, the *Schnall* court found that the safe harbor did not extend to the plaintiffs' claim that Hertz concealed or obscured the avoidable charges. (*Schnall, supra*, 78 Cal.App.4th at p. 1164.) The instant case, however, concerns no such alleged deception regarding avoidable charges and instead involves a very different type of safe harbor provision, aiming to provide a small amount of leeway for manufacturers of measuring and weighing instruments that are inherently imprecise to some degree. In protecting manufacturers of "correct" odometers from UCL liability regarding the accuracy of such instruments, section 12500, subdivision (c) also necessarily insulates them from claims that manufacturers should have disclosed potential overregistering by "correct" odometers within the tolerance permitted by California law. In sum, Nissan is not subject to liability under the UCL.

### B. *CLRA*

Plaintiffs also contend that Nissan is liable under the CLRA (Civ. Code, § 1750 et seq.), which proscribes specified "unfair or deceptive acts or practices" in transactions for the sale or lease of goods to consumers, including "[r]epresenting that goods . . . have . . . characteristics [or] benefits . . . which they do not have." (Civ. Code, § 1770, subd. (a)(5).)

Like UCL claims, claims under the CLRA may be barred under the "safe harbor" doctrine. (See *Bourgi, supra*, 166 Cal.App.4th at p. 1659.) In *Bourgi*, the purchaser of a Hummer sued the car dealer who sold him the car, alleging that the dealer violated the CLRA by representing that the vehicle was original or new when in fact it was "altered, reconditioned, reclaimed, used, or secondhand." (Civ. Code, § 1770, subd. (a)(6); see *Bourgi, supra*, 166 Cal.App.4th at p. 1655.) However, the Vehicle Code provides that a dealer must disclose to a buyer damage that has been repaired *only* when the damage is "material," i.e., the repairer's cost exceeds a threshold equal to 3 percent of the manufacturer's suggested retail price of the vehicle or $500, whichever is greater. (Veh. Code, §§ 9990, 9991.) The Court of Appeal found that "[b]y allowing dealers to repair minor damage below the 3 percent threshold and sell a vehicle as new without further disclosure of the damage, the damage disclosure law [under the Vehicle Code] provides a safe harbor for such conduct." (*Bourgi, supra*, 166 Cal.App.4th at p. 1659.) The appellate court was persuaded by the argument that car dealers must be able to rely upon "the bright-line test" laid out in the Vehicle Code's damage disclosure law for determining when repaired damage crosses the line and becomes material and must be disclosed, and that "[b]usiness practices and consumer expectations would undergo a drastic change if dealers could no longer rely on these precise definitions and requirements." (*Id.* at p. 1660.) Thus, the

court held that the Vehicle Code would provide a safe harbor against the Hummer owner's CLRA claim if the damage was not "material" for purposes of the Vehicle Code. (*Bourgi*, at p. 1661; see also *Alvarez, supra*, 656 F.3d at p. 934 [defendants were entitled to safe harbor from plaintiffs' CLRA claims challenging defendants' failure to disclose the flaws of their gasoline dispensers because " '[t]he California regulatory framework creates specific requirements [for retail gasoline dispensing] that may not be trumped by the general prohibitions of the CLRA' "].)

Like their UCL claims, plaintiffs' CLRA claim fails because the odometers in question are "correct" under section 12500, subdivision (c). As discussed above, the record before us includes no evidence of any affirmative representation by Nissan concerning the accuracy of its odometers. The allegation in plaintiffs' complaint that Nissan stated that its odometers "records the total distance the vehicle has been driven" is not actionable, because the odometers record mileage in accordance with the governing legal standard in California. Further, Nissan had no duty to disclose that its "correct" odometers overregistered mileage to some degree less than the 4 percent tolerance. (*Daugherty v. American Honda Motor Co., Inc.* (2006) 144 Cal.App.4th 824, 835 [51 Cal.Rptr.3d 118] [for an omission to be actionable for purposes of the CLRA, it must be either "contrary to a representation actually made by the defendant," or "an omission of a fact the defendant was obliged to disclose"].) The trial court correctly dismissed the CLRA claim.

### C.  *False Advertising*

■  California's false advertising law prohibits advertisements that are "untrue or misleading." (§ 17500.) To establish a violation, "it is necessary only to show that 'members of the public are likely to be deceived.' " (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 211 [197 Cal.Rptr. 783, 673 P.2d 660], superseded by statute on another point as stated in *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 228 [46 Cal.Rptr.3d 57, 138 P.3d 207]; see *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 950 [119 Cal.Rptr.2d 296, 45 P.3d 243].)

As discussed above, the record before us contains no advertising or promotional materials, or any other statements disseminated by Nissan to consumers, regarding the accuracy of Nissan's odometers. As a matter of law, statements in Nissan manuals that the "odometer records the total distance the vehicle has been driven" (as alleged in plaintiffs' complaint) are not deceptive, because the odometers operate within the lawful tolerance. Thus, plaintiffs' false advertising claim was properly dismissed.

### D. *Negligent and Intentional Misrepresentation Claims*

■ A negligent misrepresentation claim "requires a positive assertion," not merely an omission. (*Vega v. Jones, Day, Reavis & Pogue* (2004) 121 Cal.App.4th 282, 291, fn. 6 [17 Cal.Rptr.3d 26]; see *Wilson v. Century 21 Great Western Realty* (1993) 15 Cal.App.4th 298, 306 [18 Cal.Rptr.2d 779].) As discussed above, plaintiffs have provided no evidence of any affirmative misrepresentation on the part of Nissan, and rely only on allegations in their complaint about innocuous statements by Nissan about the basic function of odometers. Thus, plaintiffs' negligent misrepresentation claim was properly dismissed.

An intentional misrepresentation claim may be based on an omission, but it must be an omission of fact one has a duty to disclose. (*Apollo Capital Fund LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 240 [70 Cal.Rptr.3d 199].) We have already concluded that Nissan had no duty to disclose that its odometers might be slightly miscalibrated, because they qualified as "correct" under the law. Therefore, plaintiffs' claim fails as a matter of law.

### E. *Breach of Warranty/Breach of Contract/Breach of Implied Covenant of Good Faith*

■ Plaintiffs allege that Nissan violated the express warranties contained in manuals stating that the "odometer records the total distance the vehicle has been driven." They contend that this statement is "indisputably false," because, as Nissan has conceded for purposes of its motion, the odometer records 2 percent *more* than the total distance the car has been driven. As discussed above, plaintiffs failed to submit evidence of Nissan's alleged false statements. In any event, we agree with the trial court's determination that "because the odometer records the total distance according to the appropriate legal standard in California, as a matter of law there is no breach of any express warranty regarding the odometers."

Nor has Nissan breached any contractual obligations to consumers. As plaintiffs concede, consumers bargain for a "correct" odometer and plaintiffs have presented no evidence that this is not what they received.

Similarly, the trial court properly dismissed plaintiffs' claim for breach of the implied covenant of good faith and fair dealing. Plaintiffs allege that Nissan did not make good faith efforts to calibrate its odometers as close to zero as possible. However, we have rejected the notion that manufacturers such as Nissan are subject to such an onerous standard. Plaintiffs have failed to dispute Nissan's showing that it did not intentionally design its odometers

such that they would overstate mileage. As such, their claim that Nissan acted in bad faith is unsupported.

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

Epstein, P. J., and Suzukawa, J., concurred.

A petition for a rehearing was denied December 30, 2011.